THE STATE VS THE VICKSBURG & NASHVILLE R. R. Co.

1. DONATION OF LANDS :  *By the general government.  Act of congress*, 1862.
   The act of congress of 1862 donated lands for the endowment, support and maintenance of at least one college " for instruction in agriculture and mechanic arts."    The state accepted it upon the conditions of the grant : *Held*, that the state could only control the fund by action of the political department of the government.

2. SAME :  SAME :  *Power of the legislature over fund and colleges.*
   It was intended that the discretion should be conferred upon the legislature to make the selection of the investments for the fund.    The discretionary

power of the legislature over the subject of the investment of the funds, and also in the establishment and change of the colleges which are to be the recipients of the fund. Neither of the colleges have, as against the state, a vested right to property or corporate franchise. TARBELL J., dissenting.

3. SAME: SAME: *Coördinate branches of government, absolute and independent, in exercise of their functions.*

If the regulation of a subject belongs to the legislature, the choice of means is purely in its discretion, and no other department of the government can intervene, on the ground that the law is unwise. It pertains exclusively to the legislature to say what "stocks" are safe and solvent. Its decision is binding and conclusive on the judiciary, nor can they interpose on the suggestion that the stocks they have selected are unsafe. To attempt to control or restrain the law-making department in this respect, would be an encroachment on the functions of another branch of the government. When the state acts as a trustee, it acts through the legislature, and assumes the same measure of responsibility that pertains to it in the exercise of its law-making power. No other mode can be suggested in which the state can manage a fund for charitable uses. TARBELL, J., dissenting.

4. CHANCERY: *Jurisdiction over a charitable fund and its investment.*

A court of equity has the jurisdiction to control, advise and direct private persons and corporations in the administration of charitable funds. It may direct an unsafe investment to be called in, and a new one of its own selection to be made. It may hold the trustee responsible in proper case. The state cannot be called in its sovereign capacity to the bar of its own court, and be compelled to render an account, and be directed not to put out a trust fund in the way pointed out in her own statute. TARBELL, J., dissenting.

5. MISSISSIPPI COLLEGES: *Endowed with college scrip fund, are public corporations.*

Neither of the institutions are, in the legal sense, private corporations. They did not have their origin in private or individual endowment; both are sustained by public endowments and appropriations. The title public corporations, established and endowed by public, and are controlled by trustees appointed by the statute for limited terms. TARBELL, J., dissenting.

APPEAL from the Chancery Court of *Hinds* County.
Hon. W. B. PEYTON, Chancellor.

The bill was filed by the attorney general to enjoin the said railroad company from receiving, and the state treasurer from delivering, state bonds to the said company amounting to the sum of $218,000, held by the state as the fund arising out of the sale of the agricultural land scrip, granted by congress for a "perpetual fund," the interest to be used and devoted to the endowment and support of one or more colleges wherein the leading object shall be  *  *  to teach such branches of learning as are related to agriculture and the mechanic arts, in such manner as the legislature shall prescribe; in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions of life.  Act of Congress, July 2, 1862; 12 U. S. Stats. at Large, 503–4.  The act directs that the proceeds of the sale of the land scrip granted to the state shall be invested in stocks of the United States, or other safe stocks, yielding not less than five per centum per annum upon the par value of the stocks,  *  *  that if any portion of the said fund is lost or diminished, it shall be replaced by the state to which it belongs, so that the capital of the fund shall remain forever undiminished.  In October, 1866, the legislature accepted this grant.

By act of the legislature of 1871, the governor was authorized to receive and sell the land scrip so granted, and invest the same in state or United States bonds, which were to be placed in the custody of the state treasurer for safe keeping, two-fifths to the credit and for the benefit of the university of Mississippi, at Oxford, and three-fifths to the credit and for the benefit of a university for the education of youths of color (afterwards Alcorn University).

This law was complied with, the land scrip and the amount of $218,000 in all invested in state bonds, and placed in the treasury for safe keeping, and was so held at the time of the passage of the act of April 18, 1873, which directs the treasurer to loan the same to the Vicksburg & Nashville Railroad Co., viz., $8,000 per mile as the road is completed, taking as security therefor the note of the company at ten years, with 8 per cent. interest, with a like

amount of first mortgage bonds of the company as collaterals, the funds to be used in the construction of the road.

The bill charges that the legislation was procured by fraud, that is, in violation of the trust, and that the company is hopelessly insolvent, calls for a disclosure of the assets and liability of the company, and prays for an injunction, which was granted.

The defendants answered, denying the fraud, and filed a demurrer, and moved to dissolve the injunction; the motion was sustained by the chancellor, and the injunction was dissolved, and from this decree the case comes to this court on appeal.

*G. E. Harris,* Attorney General, and *W. L. Nugent* and *H. Cassidy,* for the state.

*Harris & George,* for the appellees.

SIMRALL, J., delivered the opinion of the court.

The fund which gives rise to this litigation was donated to the state by act of congress "for the endowment, support, and maintenance of at least one college," for instruction in agriculture, and the mechanic arts. The grant was accepted by the legislature in 1866. The state thereby assumed to deal with the fund according to the conditions prescribed in the act of congress. It requires no argument to show that the state could only control the fund, so as to make it productive and subserve the purposes of the grant by the action of the political department of the government. We accordingly find that the first thing done by the legislature was to direct that the land scrip should be sold, and the money placed in state bonds, and the annual interest paid over in certain proportions to the universities of the state. Afterwards by the act of 1873, the money, bonds, and securities derived from the sale of the land scrip, are set apart and appropriated, to be used in the construction of the Vicksburgand Nashville Railroad. For which the state treasurer shall take the notes or bonds of the company, payable in ten years, to be secured by the first mortgage bonds of the company, with interest at 8 per cent., payable semi-annually, and to be turned over, as under the previous act, to the universities.

The attorney general, in behalf of the state, brought a bill in chancery to restrain the treasurer from delivering the fund and securities, or any part of it to the railroad company. Upon motion the injunction was dissolved, and from that order this appeal was taken. As already observed, the grant was made to the state for a specific purpose. Necessarily the law making department must administer and control the fund by the selection or establishment of one or more colleges, to impart the requisite instruction, and by an investment of the fund, so as to make it productive. The state, too, it may be said, is under a moral obligation to conform to the terms and conditions contained in the act of congress. These are, that the capital shall never be encroached upon, or diminished, but shall be invested in United States bonds or other safe stock, to bear interest at not less than five per cent., and that the interest alone shall be used for the endowment and support of at least one college," etc.   *   *   The 5th section imposes a guaranty on the state against the contingency of loss by an improvident investment, so that if any portion of the fund invested, or the interest   *   *   shall be diminished or lost, it shall be replaced by the state. The capital must remain forever undiminished, and the annual interest shall be regularly applied without dimunition to the purposes mentioned. Two ideas are distinctly set forth: First, that the capital sum shall be kept perpetually invested; and secondly, if the state shall make a bad investment, and a loss should happen, the state must make it good. Where the state is under a duty to replace the capital that may be lost, it is too plain for argument that she ought to have the selection of investments, and it was intended that such discretion should be conferred, and if at any time the legislature should discover or be of opinion that an investment authorized was unsafe, the legislature is competent to direct such investment not to be made. Here is a fund to be perpetually invested in interest bearing securities, and yet none of them enumerated in the act of congress are of that character. The bonds of the United States, of the several states, of the municipalities, of the railroad corpora-

tion, have fixed maturities. Certainly all that is meant by the act of congress is, that the investment may be changed from time to time, as the wisdom of the legislature may determine, but a re-investment be made, so that the fund shall be perpetually out at interest on safe stocks or securities, to be selected by the legisla-ture. When the money under the act of 1871 was placed in state bonds, none of them had a longer time to run than three or four years. If the legislature, for any reason, should choose to change the investment, there is nothing in the legislature which prevents it. The discretionary power of the legislature over the subject is full. The foregoing observations are applicable in the main as respects the college, or colleges that may become the beneficiaries. The legislature is free to establish one or more colleges of the character described in the act of congress, and make them the re-cipients of the interest for their support, or it may, as it has done, bestow it upon the universities. These universities are public eleemosynary corporations, which dispense the bounty of the state, their founder, to such persons as it directs. They were created by the state, and are supported by public funds, and are instrumentalities in the scheme of education. Both of them are subject to change and modification by the legislature. Against the state, neither of them can set up a vested right to property, or corporate franchises. Their governing boards are appointees of the state without right or power to continue the succession. The state could withdraw the interest of this fund from them, and found another institution, and make it the recipient of it.

But the bill avers, in substance, that the railroad company is insolvent, and that the investment of the fund, or any part of it, in its bonds and mortgage is unsafe. That allegation proceeds on the predicate of law that a court of equity, by reason of its gen-eral jurisdiction over trusts and trustees, can control or defeat the action of a coördinate department of the government in the exer-cise of its legislative power and discretion, if, in the opinion of the court, it has been unwisely exercised. If that be so, then the legislative department may revise and reverse the judgment of a

court, if, in its opinion, it is improvident and erroneous. If the regulation of a subject belongs to the legislature, the choice of means is purely in its discretion, and no other department of the government can intervene on the ground that the law is unwise. It pertains exclusively to the legislature to say what "stocks" are safe and solvent. Its decision is binding and conclusive on the judiciary, nor can they interpose on the suggestion that the stocks they have selected are unsafe. To attempt to control or restrain the lawmaking department in this respect would be an encroachment on the functions of another branch of the government. The argument in support of this aspect of the bill was, that when the state assumed the position of trustee, she was subject, also, to its responsibilities; but when the state administers a trust it acts through the legislature (Perry on Trusts, § 41), and assumes the same measure of responsibility that pertains to it in the exercise of its lawmaking power. No other mode can be suggested in which a state can manage a fund for charitable uses. It must by statute derive the machinery to carry out the object. If the agent or officer of the state, acting under the law, disobeys its injunctions, transcends his powers, or refuses altogether to act, then it is in the jurisdiction of the judicial department to restrain his illegal acts and compel him to conform to the law. If in this case the treasurer should assume to part with the fund upon any other security than that named in the act, it would be competent for a court to restrain him. But if the court should undertake to declare that the investment should not be made, because, in its opinion, the security authorized by the act of the legislature was "unsafe," it would be assumption of a right to decide a question which had already been determined by the legislature, and which it alone has the right to decide. A court of chancery has the jurisdiction to control, advise, and direct private persons and corporations in the administration of charitable funds. It may direct an unsafe investment to be called in, and a new one of its own selection to be made; it may hold the trustee responsible in proper cases. Manifestly the state in its sovereign capacity cannot

be called to the bar of its own court, and be compelled to render an account and be directed; nor to put out a trust fund in the way pointed out in her own statute.    Another position in support of the bill was, that the universities were private corporations, and, therefore, acquired a vested interest in the fund, which could not, by subsequent legislation, be divested.    It is, perhaps, a sufficient answer to that, to say that the act complained of does not deprive them of the interest that is still assured to them.    Neither of these institutions are, in the legal sense, private corporations. They did not have their origin in private or individual endowment, but are sustained by public endowments and appropriations. The title to their property is in the state.    They are public corporations, established and endowed by public authority and funds, and are controlled by trustees appointed by the state for limited terms.    University *v.* Maultsby, 8 Ired. Eq., 257; 5 Stew. & Port., 17; Dart *v.* Houston, 22 Ga., 506.    The answer filed in support of the demurrer denies the fraud charged in the bill in procuring the passage of the act of 1873; that dispenses with the necessity for further consideration of that point.    But because we decline to consider it; it must not be assumed that we assent to the proposition that such an inquiry can be instituted, and for such reason a public law could be declared inoperative.

These views cover all the material questions involved.

We think there is no error in the decree, and it is affirmed.


TARBELL, J., dissenting.

By an act of congress approved July 2, 1862, there was granted to the several states, an amount of public lands to be apportioned to each state, a quantity equal to 30,000 acres for each senator and representative in congress.

Section four of that act declares " that all moneys derived from the sale of the land aforesaid by the states to which the lands are apportioned, and from the sales of land scrip " (therein) "provided for, shall be invested in stocks of the United States, or of the states or some other safe stocks, yielding not less than

five per centum upon the par value of said stocks; and that the moneys so invested shall constitute a perpetual fund, the capital of which shall remain forever undiminshed * * and the interest of which shall be inviolably appropriated * * to the endowment, support and maintenance of at least one college, where the leading object shall be, without excluding other scientific and classical studies, and including military tactics, to teach such branches of learning as are related to agriculture, and the mechanic arts, in such manner as the legislatures of the states may respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and pro fessions in life."

By section five, it is declared that no state should be entitled to the benefit of this act until it should signify its acceptance by legislative enactment.

This grant was accepted by the legislature of this state in 1866, upon the conditions stated.

On the 18th of April, 1873, an act of the legislature of this state was approved, entitled "an act to aid in the construction of the Vicksburg and Nashville Railroad." Section one of that act declares "that all moneys, bonds, or securities, now in the state treasury, belonging to the three per cent. fund, and all moneys, bonds, or securities belonging to the fund derived from the sale of land scrip received from the United States under the act supplementary thereto, known as the agricultural land scrip fund, and all moneys, bonds or securities of whatsoever kind, which may hereafter be paid into the treasury of the state of Mississippi, for and on account of either of the aforesaid funds, be, and the same are hereby appropriated and set apart in the hands of the treasurer of the said state, to be used in the construction of the Vicksburg and Nashville Railroad."

Sections 2 and 3 of this act provide that the company shall issue to the state, as security for this loan, its first mortgage bonds.

The funds in controversy exceed, considerably, the sum of

$200,000, invested in state bonds by act of 1871, and dedicated to the University of Mississippi and to Alcorn University.

To restrain the treasurer from issuing these funds to the V. & N. R. R. Co., the attorney general filed a bill in which it is charged, among other things, in addition to the acts already quoted, that it was never contemplated that these funds should be loaned to a railway company or used in the construction of a railroad; that the attempted loan is in violation of the fundamental conditions of the grant; that the said railroad company is absolutely and hopelessly insolvent; that their notes, obligations and bonds will not be of any value, being entirely worthless for any purpose; that said line of railroad is a mere projected railroad, not possessing any elements of success or hope of completion, having now only between two and five miles of road completed; that the road will never be able to return the fund proposed to be loaned; that this act of the legislature was procured to be passed by the fraud of the railroad company, and is in violation of the trust, and endangers the state in her liabilty to make good this fund, which was never intended by congress to be used in the building of railroads.

The injunction which was granted in this case was on motion dissolved, and hence the case comes to this court.

That a state may become a trustee, the authorities are abundant.

That the act of congress created a trust, with the most explicit conditions, it is only necessary to refer to the act itself, already quoted.

If it was the intention of congress to transfer this princely donation to the treasury of the states, to be used in their discretion in the construction of railroads and other enterprises, and to permit it to become mingled and blended with their revenue, subject to appropriation in the ordinary course of legislation, the language of the act sounds like absurd folly. In this view, the terms of the grant would be little else than a stupendous cheat and a deliberate piece of hypocrisy on the part of the national au-

thorities.   On the contrary, the terms of the grant must be accepted as imposed in good faith.

At the very outset of this case we have in the act of the legislature of April 18, 1873, a plain, palpable, undeniable, if not admitted violation of the grant of congress.   By the very title of the act itself, the loan is declared to be to aid in the construction of a railroad; whereas, by the act of congress, the fund is required to be invested in safe, paying stocks.   With the same propriety, these funds might be employed in the experiment of a cotton or woolen manufactory or in running a cotton plantation.

Probably few, perhaps none, approve the legislation which is thus assailed, but the idea seems to obtain that the legislature cannot be restrained.

There were good lawyers in congress.   They must have known whether there was power in the courts to prevent a waste of these funds.   If not, they enacted a farce in the insertion of such stringent conditions in the grant.   But the whole difficulty vanishes when we hold the state to be a trustee; that the legislature derives its power over these funds from the grant, and not from its ordinary political power; that the state acts through agencies, of which the legislature is only one, and the state treasurer is another.   As in numerous other matters of legislation, in violation of a constitutional or natural right, or in violation of the positive conditions of a trust, the legislature is controlled by courts operating upon legislative agencies.   It is important to note here that in the case under consideration, the funds involved are not the property of the state.   The state controls them only as trust funds, under the grant in her fiduciary, and not in her political character.   Over such control, by enjoining the state treasurer, the courts of equity have the same jurisdiction as over any other trustee.

These propositions are assumed:

1. That the act of congress of July, 1862, with its amendment, is an authority originating a trust charity, defining its nature, ap-

pointing the state as trustee, and prescribing and limiting the powers and duties of the trustee.

2. That the state, as trustee, is subject to the same rules of equity as would, under like circumstances, be applied to an individual as trustee.

3. That the acts of the legislature, with reference to this trust fund, are the acts of the state as trustee, and not as sovereign, through this agency, whose acts, as trustee, are to be adjudged by fiduciary, and not political standards and maxims.

4. That because the act of congeess holds the state responsible, at all events, for the loss of the fund, as ordinary trustees are so held in some events, that this does not expand her powers as trustee (any more than similar risks do those of individual trustees), beyond the limits prescribed by the acts of congress, nor give her a discretion to violate the trust.

It is understood to be conceded that the act of the legislature of April 18, 1873, clearly and unquestionably violates the act of congress..

And it is understood to be further conceded that, in loaning this fund, the legislature, in behalf of the state, assumes all responsibility for the funds, and concedes the duty of replacing or making good any loss occasioned by the loan.    Thus, a portion of the terms of the grant are repudiated, while other conditions are acknowledged as binding.

The pretext or excuse for such legislation is, that the courts have no power to restrain it.    How futile this is I have endeavored to show by the fact that the courts operate upon the agents who execute these laws, and not directly upon the legislature.

With reference to the magnificent donations of congress, two theories have obtained in different states, followed by corresponding results.    In one class of states these donations have been faithfully employed within the letter and spirit of the grants, the people, the legislatures and the courts coöperating to the same end.    Take Iowa as an illustration of one class.    She has a school fund, in land and money, valued at not much less than $5,000,000.    Every

school district has its school building; every neighborhood, town and village a seminary or academy; normal schools and colleges accommodate the entire educable population, and her children are educated almost without taxation. In another class of states, on one pretext or another, there has been an indifference toward these donations, except to squander them. Hence, in this class, these moneys and lands have been wasted, with no acknowledged power to prevent the disaster. Under such a policy, schools have languished; compared with the other class, there is no fund for their support; no system of free schools, except by taxation, of which the people complain; no normal schools or academies, and a solitary university is but poorly supported. If, in the history of our state, there is a chapter which can cause more regret than another, it is the management of these donations of congress.

Upon the same grounds now advanced, the funds belonging to the state university were some years ago appropriated by the legislature. Then, as now, it was urged that there was no control over legislation, and the appropriation of the funds of the university by legislative enactment was said, then as now, to be the creation of a debt by the state to the institution upon which interest would be paid. Unfortunately, this promise and hope have not been realized. The debt to the university doubtless exceeds $1,000,000, and amounts, according to the public records, to about $1,500,000. The interest on this indebtedness cannot be less than from $60,000 to $90,000 a year, the whole of which is essential to the efficiency of the university, and could be profitably expended; yet only a fraction of this interest has been paid, and these fractional allowances have been dispensed with murmurs and complaints, and as a charity, not as a right. As in the past, so, it is feared, it may be in the future. The greatest hope of this state, for black and white, is an efficient system of free public schools, within the neighborhood of every child therein. The unfortunate theories, as they seem to me, which have prevailed in this state seem again to obtain, and thus " the largest and (in my judgment) the most important charity in the state is, by this

theory, turned adrift, without chart, compass, rudder or anchor ; bereft of that protection which all trusts and charities have always secured, the beneficient control of a court of conscience, thus placing in imminent danger of perpetual loss this perpetual fund."

It is said there is no right without a remedy, and this is the especial boast of chancery. In my judgment, the bill in this case presents peculiar equities for the favorable consideration of the courts having cognizance of such matters. The appeal in this case is in behalf of the 350,000 educable children of the state, and of the people who justly complain of taxes.

Counsel on both sides have made the most exhaustive arguments, leaving unreferred to no authority bearing upon the points discussed. I do not propose to review the questions involved beyond what I have already done, which is a mere general expression of views as to the law and the policy which seem to be embraced in this case.

The contest is between our universities, organized for the dissemination of education, and employed to utilize a great public charity provided by the bounty of the United States, with prospects of increasing usefulness, if fostered and protected, on the one hand, and a railway company on the other, with no hope of ever returning any portion of this loan  Thus will be done indirectly what the constitution prohibits being done directly, viz : that " the credit of the state shall not be pledged or loaned in aid of any person, association or corporation." Constitution, art. 12, sec. 5. By this loan the state becomes the indorser and guarantor of an insolvent railway. The only course left to the people to escape taxation for this debt will be repudiation. This is being done as to the indebtedness to the University at Oxford, and judging from the past, there is, perhaps, danger of a repetition of such action in the future.

At least it seems to me to be the part of wisdom to avoid the opportunity and the temptation, by restoring the injunction in this case and enjoining the treasurer. If this could be done, either by the courts, or as the result of legislation, our universi-

ties would more than repay a generous government for its bountiful gift; but if not, they will continue to eke out an inefficient existence, which has characterized them from the first, owing to the same policy which appears to be prevailing in the present instance. Without standing in the courts, the hope of the universities is, of course, in the legislature, which, for their sake and for the cause of education, I trust, will prove to be in reality, as probably it is in fact, the assembled wisdom of the commonwealth.

In my view, the law, justice and policy concur in the conclusions herein set forth.

The decree dissolving the injunction should be reversed, and the injunction restored.