## STATE EX REL. WYOMING AGRICULTURAL COLLEGE ET AL. v. IRVINE, STATE TREASURER.

PLEADING—DEMURRER—COLLEGES AND UNIVERSITIES—AGRICULTURAL COLLEGES—CONGRESSIONAL GRANTS—SELECTION OF BENEFICIARY—CONSTITUTIONAL LAW—IMPAIRMENT OF CONTRACT OBLIGATIONS—PUBLIC INSTITUTIONS—ESTABLISHMENT AND LOCATION—STATUTES—REPEAL—LEGISLATURE—DISSOLUTION OF PUBLIC INSTITUTION BY REPEAL OF ACT—PUBLIC POLICY IN LEGISLATIVE MATTERS—WYOMING AGRICULTURAL COLLEGE.

1. While a demurrer admits the truth of the material allegations of fact in the pleading demurred to, it does not admit arguments, legal conclusions, or inferences not supported by the facts and circumstances therein set forth, nor the construction of statutes, nor facts that are immaterial or against common knowledge.

2. Under the act of Congress of July 2, 1862, granting to the several states certain lands for the endowment and support of at least one college devoted to instruction in such branches of learning as are related to agriculture and the mechanic arts, and the subsequent act of Congress of August 30, 1890, appropriating annually certain sums of money, arising from the sales of public lands, to each State and Territory, for the more complete endowment and maintenance of such colleges, the grants and appropriations therein provided for were and are made to the

States respectively and not to any particular institution, though the States are severally charged with the trust of applying the funds so derived solely and faithfully to the purposes set forth in the acts making the grants and appropriations.

3. The State Treasurer, who is designated by act of the legislature as the proper officer to receive the moneys granted and appropriated to the State by Congress for the benefit of at least one college devoted to instruction in agriculture and the mechanic arts, is the agent of the State, to hold and disburse the fund as directed by the laws or the proper authority of the State.

4. Under said acts of Congress of July 2, 1862, and August 30, 1890, making grants of land and appropriations of money respectively to the several States, for the benefit of at least one college devoted to instruction in agriculture and the mechanic arts, it is the right and duty of the State to select or designate the institution to receive and expend the funds so derived, and for the faithfulness of such expenditure the State is made responsible by said acts.

5. In selecting or designating the institution to receive the funds derived from the grants of land and money under the said acts of Congress of July 2, 1862, and August 30, 1890, for the benefit of colleges devoted to instruction in agriculture and the mechanic arts, the State can only act through its legislature, unless possibly a proper controlling provision on the subject should be made in the constitution.

6. Where there are two or more conflicting claimants to the funds derived under said acts of Congress, each possessing the requisite qualifications, it is the duty of the State, acting through its proper authority, as a prerequisite to a disposition of the grants, to designate the beneficiary.

7. The University of Wyoming fulfills all the prescribed conditions upon which lands and moneys are granted and appropriated to the State by the acts of Congress respectively of July 2, 1862, and August 30, 1890, for the benefit of at least one college devoted to instruction in agriculture and the mechanic arts; since said University is an educational institution provided by the State, and though embracing several departments, its authorized courses of study cover the branches of learning in aid whereof the donations were and are made, and it maintains a department or departments for the purpose of imparting instruction in those branches.

.8 The said acts of Congress do not require that the "leading object" of the institution selected or designated to receive the donations shall be in its entirety, or as a complete institution, the teaching of the branches of learning related to agriculture and mechanic arts; it is sufficient if the aided institution maintains a college or department whose leading object is instruction in the prescribed branches, and applies the donated funds to the support of such college or department. The institution will not be rendered incapable of receiving the donations from the fact that the majority of its students are enrolled in other departments.

9. The various acts of the legislature upon the subject of the acceptance of the grants and donations under the acts of Congress of July 2, 1862, and August 30, 1890, for the benefit of a college devoted to instruction in agriculture and mechanic arts, and the disposition thereof, require the State Treasurer to turn over the funds received by him under said acts of Congress to the University of Wyoming.

10. If it be conceded that the use of the funds derived under the said acts of Congress by the University of Wyoming was assented to by the legislature only until the establishment of a separate agricultural college in the State, it would require further express legislative authority to divert such funds from that institution; the funds could not lawfully be paid over to another institution without direct legislative authority.

11. The charter of a public corporation is not a contract and does not come within the constitutional provision prohibiting the passage of laws impairing the obligation of contracts; therefore, where a college is a public institution, or, if a corporation, a public corporation, its charter may be amended, altered, or repealed at the pleasure of the legislature.

12. The act establishing the Wyoming Agricultural College declared in the first section thereof that the college should be "a State public educational institution;" its trustees were given fixed terms of office, were to be appointed by the Governor by and with the advice and consent of the Senate, and all vacancies were to be filled by the Governor until the next session of the legislature; a site was required to be procured for the college, and, whether procured by purchase, donation or otherwise, the title was to be taken in the name of the State; its diplomas conferring degrees were required to bear the seal of the State; no

religious qualification or test was permitted to be required of any student, officer or member of the faculty, and sectarian teaching therein was expressly prohibited; a board of visitors was provided for to be appointed by the Governor, who were required to report to the legislature; and the institution was required to be located by a vote of the people. *Held,* that said college was a public institution and not a private corporation, and the ·act establishing the same was subject to amendment or repeal by the legislature.

13. No contract obligation was violated by the act of 1905 repealing the act of 1891 establishing the Wyoming Agricultural College, since said college was a public institution, and not a private corporation.

14. The fact that, after the founding and establishment of a public State institution by legislative enactment, property may have been given, devised, or bequeathed to it, or in trust for its benefit, is not sufficient to change the character of the institution, nor to deprive the legislature of its plenary power of alteration, amendment, or even repeal of the act; in such cases there is no contract relation between the State and the donor, but the donation must be presumed to have been made with knowledge of the public character of the institution and the power of the legislature to control it.

15. The authority conferred upon the trustees, by the act establishing the Wyoming Agricultural College, "to possess and use for the benefit of the agricultural college the buildings and sites" provided therefor, and "to take and hold for the use and benefit of the college any real and personal estate" and "to dispose of the same in such manner as they may deem most conducive to the interests" of said college, is not inconsistent with the character of a public educational institution. In respect thereto the trustees are public agents.

16. The provision in the act of 1891 establishing the Wyoming Agricultural College requiring the trustees to conform to the will and directions of the donor of any property "granted, devised or bequeathed to the use of said agricultural college" must be construed in harmony with the other provisions of the act showing the college to be a public institution, and with the declaration in the first section that the college is "a State public educational institution," and such provision cannot be held sufficient in itself to render the college a private corporation, and the act establishing it beyond the repealing power of the legislature.

17. The Constitution of the State requires the legislature to provide for the establishment and maintenance of a complete uniform system of public instruction, embracing free elementary schools of every needed kind and grade, a University, and such other institutions as may be necessary, and, in a section locating for a specified period certain named public institutions, provides that the "Legislature·shall not locate any other public institutions except under general laws, and by vote of the people." *Held,*

    (a) That the Wyoming Agricultural College established by an act of the legislature as a State public educational institution was created and established by that act, and not by a vote of the people locating it under the provisions of such act.

    (b) The people have not reserved to themselves the right to establish or create public institutions, but only the power to vote upon the location of such institutions as may be established by the legislature.

    (c) The location of an institution differs essentially from its creation.

    (d) The fact that, as authorized by the act establishing the Wyoming Agricultural College, a place for its location was selected by vote of the people, did not operate to prevent a legislative repeal of the act establishing the institution.

    (e) The constitutional provision prohibiting the legislature from locating public institutions except under general laws and by vote of the people cannot be construed as requiring a public institution once established by legislative enactment to be perpetuated, or as preventing the legislature from repealing an act establishing such an institution,. so far as its future existence is concerned, though its location may have been selected by vote of the people.

18. Where the Legislature has all the power that exists anywhere to establish an institution, it necessarily has the power to dissolve it, unless the doing so involves the violation of some constitutional provision.

19. The Legislature is vested with all legislative powers of the State; it may do anything within the domain of legislation which is not repugnant to the State or Federal Constitutions; and constitutional restrictions upon the Legislature are not to be enlarged by construction beyond their terms.

20.  Though the Legislature may have pursued a mistaken policy that is no reason for avoiding a statute otherwise unassailable.  The courts are not vested with the right to determine the policy of the State in legislative matters.

21.  The act of 1905 repealing the act of 1891 establishing the Wyoming Agricultural College was a valid enactment, so far at least as to render ineffective that portion of the former act establishing the college, declaring its objects, authorizing the appointment of trustees therefor, and conferring specified powers upon them, at least as to the future exercise of such powers; and the said repealing act discontinued the college, so far as it had any standing under the former act, and therefore deprived the college and its trustees of any capacity, which they might otherwise have had to receive and expend the government donations under the acts of Congress of July 2, 1862, and August 30, 1890, making certain grants and appropriations to the several states for the benefit of a college or colleges devoted to instruction in agriculture and the mechanic arts.

[Decided January 31, 1906.]              (84 Pac. 90.)

Original proceeding in mandamus.

Heard on demurrer to petition and alternative writ.  The facts are stated in the opinion.

*C. W. Burdick,* for respondent, in support of the demurrer.

The relators are without capacity to sue in this proceeding:  First, as to the trustees, because (a) the said trustees are not the real party in interest, and (b) because by act of the Legislature the said trusteeships have been abolished; and, second, as to the Agricultural College, because (a) the said Agricultural College is not the real party in interest, and (b) said college being a mere state agent has no power to bring this or any other action unless such power is conferred upon it by express statutory authority.

Under the language of the acts of Congress making the donations, which are claimed for the alleged college here in question, the grants and donations in each case run directly to the several states and territories, and not to colleges, institutions or subordinate organizations located therein.  Hence, the ownership of the grants and donations is in the

states and not in such organizations as may have been created or established by charter or act of State Legislatures. The ownership being in the states, they alone are the parties who could properly pursue the funds if lost, stolen or diverted, and in this proceeding the state alone is the real party in interest who can complain of any diversion or misuse of the money, grants or donations, and neither the acts of Congress, nor any subsequent legislation by the State of Wyoming, show the trustees of the Agricultural College as trustees, or the Agricultural College itself to have such an interest in the said grants as to give them the interest and capacity to sue. Nor do they possess individually or collectively, or as an organization, such capacity.

With respect to the capacity of the trustees, we contend, (a) That they are disqualified under the code. Section 3467, Revised Statutes, 1899, with certain exceptions not found here, provides that "Actions must be prosecuted in the name of the real party in interest." Trustees of a corporation, either public or private, are mere agents and not the real parties in interest. Under some circumstances they hold the legal title to property of the corporation, and in such cases they possibly would be permitted to sue in their own names as trustees in a court of law, but even then the beneficiary could intervene. (Thomp. on Corp., Sec. 7593.) The trustees in this case, however, are mere agents of the state, appointed by the state, responsible to the state, without authority from the state to prosecute actions of any kind. They are not vested with any interest in the property sought to be recovered, and, as shown by the acts of Congress, the state is the party having the real title ownership and interest in that property. They have not even a beneficial interest, and in the absence of either a real or beneficial interest cannot, under the provisions of Section 3467, Revised Statutes, 1899, prosecute this suit. (Hunter v. Com'rs., &c., 10 O. St., 515.)

A further disqualification on the part of the trustees to sue arises from the fact that the trusteeships which they

here allege they are occupying have been abolished by act of the Legislature. Whatever may be contended as to the power of the Legislature to repeal that portion of the act of 1891, creating and locating an agricultural college, and referring to the Agricultural College, there can be no question of the power of the Legislature to abolish the trusteeships created by that act; and this was done by the act of 1905.

The trustees authorized to be appointed by the act of 1891 are mere agents of the state within legislative control. The terms of office provided in said act, as well as the salaries, and including even the offices, could be modified, altered or even abolished by act of the Legislature. (Head v. Univ., 47 Mo., 226; State ex rel. Hamilton v. Grant, 81 Pac., 798.)

Concerning the power of the Agricultural College to appear as relator in this proceeding, there are two objections: (a) As in the case of the trustees, the college is not the real party in interest. We have noted the terms of the Federal statutes making it quite apparent that the donations therein made were grants to the several states, and not to any of their subordinate organizations or agencies. Hence, it follows that the states, as the owners of the subject matter of the action, would, in any proceeding based thereon, be the real party in interest, and under our code any such action should be prosecuted in the name of the state upon the relation of the Attorney General. The view herein expressed, that the property in the grants and donations made by the Government of the United States is in the states and not in the agencies or institutions to be ultimately benefited by the grants, is confirmed by the views of courts. (Trustees, &c., v. Winston, 5 S. & P., 24.)

The real party in interest in any action is the one possessing the ownership of the subject matter, and where the question of capacity is raised, one not possessing such ownership, and not coming within the exceptions named in Section 3467, cannot prosecute an action for the recov-

ery of such subject matter. The action cited is exclusive in its scope and disqualifies any and all persons not coming within the classification of "the real party in interest" or not coming within any of the exceptions of the statute.

In Section 4197 it is provided that the writ of mandamus may issue on the information of the party beneficially interested. And on behalf of the Agricultural College as relator, it may be contended that that institution is shown to have such a beneficial interest in the funds sought to be recovered as to bring it within the purview of the section cited. To determine whether or not such an interest has been created would necessitate a discussion of the scope, effect and standing of certain legislative acts and the effect upon those acts of certain clauses of the constitution. That particular discussion belongs to another section of this argument. It will be made by co-counsel and its application will become apparent as the argument progresses.

But this proposition may well be interposed at this point as pertinent, i. e., that even though a relator in an application for a writ of mandamus be shown by the pleadings or otherwise, to be beneficially interested in the subject matter, still he may not prosecute the action unless he have capacity to sue. If, therefore, the Agricultural College be lacking in the capacity to sue, it is immaterial whether it have a beneficial or any other interest in the subject matter of the action.

(b) A second ground that disqualifies the Agricultural College as relator is the fact that it is a mere creature of the Legislature and a mere agent of the state, upon which no express power either to sue or to be sued has been conferred by its creator. Depending upon the circumstances of their creation and organization, colleges and universities have been held to be either public or private corporations, or even mere state agents, without any corporate powers whatever. When chartered by act of the Legislature, or incorporated under general law, but endowed from private sources, they are private corporations with the granted and

incidental powers such as all corporations possess, including, if granted or necessarily incidental to their existence, the power to sue and be sued; but when created by legislative enactment providing for public control, with officers and trustees responsible to the state, or if created for the purpose of carrying out public objects or benefits, they become either public corporations or mere state agents, not possessing corporate powers other than those expressly conferred by the act of the creation.

Upon the assumption that the Agricultural College created by the act of 1891 was a corporate entity, it does not fall within any of the judicial definitions of a private corporation, but is a public institution or corporation, as determined by the act creating it, upon the definitions given of such an institution or corporation. (Trustees, &c., v. Winston, 5 S. & P., 17; Louisville v. Univ., 15 B. Mon., 650; Univ. v. Maultsby, 8 Ired. Eq., 257; Head v. Univ., 47 Mo., 226.)

In some states the courts have gone to the extent of holding that organizations such as state universities and colleges are not even corporations, but mere creatures of the Legislature, incidents of the government, and mere agents for the purpose of carrying out its objects. (Weary v. Univ., 42 Ia., 335.) The elements necessary to classify the Agricultural College of Wyoming as either a public corporation or a mere state agent are present in the act of its creation, but if upon this question there was any doubt it would be sufficient to call attention to the language of Section 1 of the act wherein it is provided that the college shall be "a state public educational institution." This language seems beyond any cavil to fix the character of the institution as an arm or part of the state, a mere wheel of its machinery, and necessarily, therefore, within its absolute control. It is our contention that the Agricultural College, being a public corporation or mere agent of the state, cannot maintain an action in any of the courts of the state, unless it have that power conferred upon it by

express authority, and it is an established rule that grants of powers to corporations are to be strictly construed. (Com'rs. v. Mighels, 7 O. St., 115; Hunter v. Com'rs., 10 O. St., 520; Sayre v. Road, 10 Leigh, 454; Weary v. Univ., 42 Ia., 335.)

*N. E. Corthell,* also for respondent.

There are certain constitutional questions arising upon the petition chiefly under Sections 15 and 23 of Article VII of the State Constitution. By Section 15 the establishment of the University with its several departments was confirmed, and all land and other grants made or to be made to the University, or in aid of the instruction to be given in any of its several departments, were vested in the University. Under these provisions the question arises, what was the University; and what were its departments; and what was the instruction given in them?

Such as these were, the integrity of the institution is confirmed and perpetuated by the constitution, and its rights fixed by that instrument. Section 23 deals with the subject of the location of the University and other institutions after ten years. The location of the University was fixed at Laramie during that time. It was not a subject within the province of the Legislature. With all its accessories, it was located for the time being. After ten years the Legislature was permitted, not to relocate it, but to enact a law submitting the question of its location at a general election to the qualified voters of the state to be determined by a majority of all votes cast on the question. By the same section a like restriction was laid upon the power of the Legislature with reference to the location of all "other" public institutions. Each was to be located under "general" laws and by "vote of the people" only. These provisions relating to the determination of locations by vote of the people were contained in a single section or paragraph. It is to be presumed that the "votes" intended were uniform in kind, a vote at a general election, a vote

of the qualified electors, a majority vote of those cast on the question, and, perhaps, a vote postponed for ten years; and in any case a vote representing the untrammeled choice of the electors.

When the constitution was prepared and adopted the University had developed into a public institution of well defined character and scope, including, among other things, a College of Agriculture fully organized and conducted in harmony with the plan of the legislation of Congress as interpreted and applied by the officers of the government. Moreover, the common schools and high schools of the state had been gradually adapting themselves and their courses of instruction so as to harmonize with and lead up to this institution.

There is some apparent conflict, or, rather, want of coherence, between Sections 1 and 15 of Article 7 of the Constitution. In the first section the Legislature is directed to provide for the establishment and maintenance of a complete and uniform system of public instruction, including, among other things, a university. This section expresses the same command with respect to elementary schools, etc. A stranger reading this section by itself might suppose that there were none of these institutions in the territory at the time the constitution was formed, and that the Legislature had been left with a free hand to execute the general command to create, define, organize and give such form to all these institutions as it might deem expedient. In point of fact, however, we know that both the elementary schools and the University existed and were in full operation at the time. We must keep in mind that the constitution was not framed for a people entering into a political society for the first time, but for a community already organized, furnished with legal and political institutions, adapted to all, or nearly all, the purposes of civil government. (People v. Draper, 15 N. Y., 532; People v. Roberts, 34 N. Y. S., 641; People v. Potter, 47 N. Y., 375; State v. Stanford, 24 Utah, 148.)

It may be that, under the head of "Other Institutions," the constitution contemplated the establishment of schools below the elementary schools, so-called, or schools intermediate between the elementary schools and the university. The term "university," of course, imports that there could be no higher institution. "Other" institutions import the exclusion of those enumerated. (Rasmussen v. Baker, 7 Wyo., 117; Bank v. Foster, 9 Wyo., 157; Denver v. Wyatt, 28 Colo., 129; Pub. Co. v. Fisher, 166 U. S., 464.)

The University as it existed at the time the constitution was adopted, is a thing which, by force of that instrument, was confirmed in its "establishment," "with its several departments"; and all lands granted or to be granted by Congress "unto the University as such, or in the aid of the instruction to be given in any of its departments" and "all other grants for said University or for any of its departments" were, by the constitution, "vested in the University" and dedicated exclusively to those purposes. In view of these provisions of the constitution, can the Legislature do any of the following things? (1) Establish another university or invest another institution with its functions. (2) Change the University or its location by taking away any department or any essential part of the organization as it was constituted at the time the constitution was formed. (3) Take away or divert to another institution any of the lands or other grants vested by the terms of the constitution in the University. (4) Restrict the qualified electors in the exercise of the right to locate any public institution by their votes.

In confirming the establishment of the University, as well as providing for its location, it is significant that it is spoken of as the University. There is nowhere in the constitution any implication that there may be more than one university. By force of the constitution, whatever constituted a department of the University at the time was constitutionally established as a part of it; whatever had been given or might thereafter be given in aid of the instruction

to be offered in any of these departments, was expressly vested in the University. It was declared that whenever the State University should be spoken of the term should, *ipso facto,* include all of the departments of the institution.

Upon this subject the people legislated in the constitution, and pre-empted the field. They did not authorize the Legislature to give or withhold any of the lands or money grants of Congress, but themselves gave all these directly to the University, with the exception of the general grant of 260,000 acres for charitable, educational, penal and reformatory institutions, which, perhaps, were left to be divided by the Legislature among the institutions of these four classes. The lands granted for the support of the Agricultural College being a "grant in aid of the instruction given" in the University and a "grant for one of its departments," as well as the moneys then granted or subsequently to be granted for these purposes, were expressly appropriated by the people themselves in their constitution and "vested in the University." Constitutional provisions, whether operating by way of grant or limitation, are to be enforced according to their letter and spirit, and cannot be evaded by the legislation which, though not in terms trespassing upon the latter, yet in substance and effect destroy the grant or limitation. (Fairbank v. U. S., 181 U. S., 283; Gemmer v. State (Ind.), 71 N. E., 478; *In re* Senate Res. (Colo.), 21 Pac., 472; *In re* Senate Bill, &c. (Colo.), 21 Pac., 471.)

Assuming for the purpose of argument that the Legislature had power to submit to the people the question of the location of the Agricultural College, and to divorce that institution from the University and set it up at the designated place as a separate establishment, did the Legislature proceed constitutionally in submitting the question of such location, and was the location determined by a constitutional vote? The constitution, in a single section, has dealt with the question of the location of all public institutions; it has clearly expressed a purpose that such institutions

shall not be located by the Legislature, but by the people. It does not seem probable that the framers of the constitution had in mind anything but one, uniform method of determining these locations. It may be that the locations of institutions other than the four particularly enumerated might be made prior to the expiration of the ten-year period mentioned in the constitution, though it would seem that there is no reason for postponing the location of the designated ones, which was not applicable with at least equal force to all such institutions. Unless it be said that an emergency might arise requiring the earlier location of other public institutions, there would appear to be no conceivable reason to think it was not the intent of the constitution to postpone for ten years the location of any of these institutions whatsoever.

However this may be, it is certainly not reasonable to assume that the other restrictions thrown around the exercise of the power of location were not intended to apply to all. There is certainly no reason why the location of the seat of government should be required to be submitted at a general election, which is not equally forcible when applied to the selection of a location for the poor farm, or the deaf and dumb asylum. Likewise, when the constitution speaks of submitting the question to a vote of the people, it does not mean literally *all* the people within the limits of the state, but only the qualified electors, spoken of in a preceding sentence of the paragraph. Then, too, it was quite as important and reasonable that a majority vote of those cast upon the question should be required to locate the institutions not named as well as those named in the section. Finally, it is submitted, that the requirement that the question shall be submitted to a vote of the people means an unrestricted vote or choice of all of those who are qualified to vote at all.

But the act of the Legislature itself fixed the location within very narrow limits. The qualified electors were not left free to locate the institution where they pleased within

the limits of the state. They were merely permitted to select one among a very few possible locations coming within the qualification prescribed in the act. It is probable that there were not over six locations in the entire state which complied with all of these conditions. There were not more than six towns of the required size below the altitude named. More than two-thirds of the area of the state lies above the prescribed altitude. More than three-fourths of the population of the state in 1890 and more than two-thirds in 1900 were located above that altitude. It is a question of perhaps one hundred feet either way whether the Town of Lander itself was eligible on this score. At the utmost not more than 2,500 to 3,000 people in the aggregate lived within the areas made eligible by the act. The Bill of Rights contains a number of express provisions which seem to us to be violated by the enactment. (Art. I, Secs. 1, 3, 27, 34, 36.)

If the Legislature had power to impose the restrictions adopted in this case, it certainly had power to impose still others. It might more reasonably have required railroad connections. It might have put the limit of population at one thousand, or five thousand, or ten thousand. It might have fixed the altitude at ten thousand feet and restricted the location to greater altitude rather than less; and, in innumerable ways easily conceivable, it might have sent the location to this point or that point, or restricted it within this or that particular small area at its own caprice. As to candidates for the site of the Agricultural College, the question seems to us in no wise different from that of candidates for a constitutional office in the sense now under consideration. It is settled law that the Legislature cannot add to or change the constitutional qualifications of officers or candidates for office. (McCreary on Elections, 347; Page v. Harden, 8 B. Mon., 648; State v. Acton (Mont.), 77 Pac., 299; Thomas v. Owens, 4 Md., 189; Barker v. People, 3 Cow., 686; Cooley on Const. Lim., 78, 79; Matter of Dorsy, 7 Port., 293.) Nor can the Legislature indirectly impair

the freedom of choice or the full effect of the elector's vote
by a cumulative voting law. (Maynard v. Board, 84 Mich.,
228.) Nor can the voter be restricted to less than the num-
ber of offices to be filled. (State v. Constantine, 42 O. St.,
437.) Nor can he be restricted to the names printed on the
ballot. (State v. Dillon, 32 Fla., 545; 14 Southern, 383.)
Nor can the Legislature add to the constitutional qualifica-
tions of the voter himself; nor take away the right to vote
from those qualified under the constitution. (Allison v. Blake
(N. J.), 29 Atl., 417.) Nor can the Legislature postpone
an election beyond the time fixed in the constitution. (Gem-
mer v. State (Ind.), 71 N. E., 478.) The question seems
in many respects analagous to the question of the power of
the Legislature to restrict or limit the appointive power of
a public officer derived from the constitution. (People v.
Angle (N. Y.), 17 N. E., 413.)

We wish to add a word as to the classification adopted
by the Legislature in the act under consideration. We are
not aware of any legitimate or proper purpose which could
be served by this classification. None of the qualifications
required arise out of the nature or essence of the institu-
tion to be located. The science or art of agriculture, if it
is to benefit the greater part of our people, must necessarily
be carried on under conditions similar to those in a higher
altitude than that fixed in the act. The needs of the greater
number of people would require that agricultural experi-
mentation be carried on above rather than below the alti-
tude named. The real and obvious reason for the condi-
tions prescribed was to take the institution away from the
southern part of the state, to make it impossible for the
majority of the people to locate it in their own midst, to
convert a minority in numbers into a majority in power, and
to deprive not merely a few, but a vast majority, of the
people of the state of the political privilege and the civil
right of locating the college in a situation convenient for
their use. In any classification there must be a substantial
distinction having reference to the subject matter of the

proposed legislation, between the objects or places embraced in such legislation, and the objects or places excluded. (Standard Cattle Co. v. Baird, 8 Wyo., 144; Foley v. Mayor (N. J.), 38 Atl., 833; Lowthrop v. Inhabitants (N. J.), 44 Atl., 755; Burnett v. Dean (N. J.), 49 Atl., 503; Bassette v. People, 175 Ill., 101; State v. Stanford, 24 Utah, 148.)

*J. W. Lacey,* also for the respondent.

The Dartmouth College case (4 Wheat., 629) proceeds upon the theory that the college there in question was a private eleemosynary institution—a private corporation. The statute (R. S., Sec. 504 *et seq.*) created the Wyoming Agricultural College. The vote of the people merely located the creature of the Legislature, and had no part in its creation.

There are no express provisions creating the college a corporation, nor giving it any power to sue or be sued. The question, then, arises as to the power of the state over this its creature which in its name and under its control from first to last is to accomplish its purposes. The Legislature had the clear power to repeal the statute creating the college, for the reason that it was simply a part of the machinery of the state government provided by the state itself through its own agency, for the purpose of aiding in the general public matter of educating the youth of the state, and it had the power, therefore, at any time to cease to employ these agencies with or without substituting other agencies as in the legislative wisdom might be thought best. It results that the Wyoming Agricultural College has ceased to exist, and, therefore, does not have capacity to sue. As a necessary consequence, the trustees of the Wyoming Agricultural College are not trustees at all, and the entire petition is irrelevant and redundant matter by those who have no capacity to sue. Therefore, upon the general question whether or not the repeal of the Agricultural College law would generally impair the obligation of a contract, it is clear upon the author-

ities and upon reason that the decision would have to be against the plaintiffs in this case, and that the repealing act would necessarily be held constitutional.

But this case is to be decided not upon the general principles alone. In this state the people guarded against difficulties such as are sought to be raised by the plaintiff here. "As the power to grant unamendable and irrepealable charters is one readily susceptible of being greatly abused, to the prejudice of important public interests, and has been greatly abused in the past, the people in the majority of the states, in framing or amending their constitutions, have prudently guarded against it by reserving the right to alter, amend or repeal all laws that may be passed, conferring corporate powers. These provisions give protection from the time of their adoption, but the improvident grants theretofore made are beyond their reach." (Cooley Const. Lim. (6th Ed.), 335, 336.)

For the reasons and along the lines stated by Judge Cooley, the people of this state wrote into their constitution the following provision: "The Legislature shall provide for the organization of corporations by general law. All laws relating to corporations may be altered, amended or repealed by the Legislature at any time when necessary for the public good and general welfare, and all corporations doing business in this state may as to such business be regulated, limited or restrained by law not in conflict with the constitution of the United States." (Art. 10, Sec. 1.)

Under that provision, the act of 1891 was repealable, even though the college in question had been made a private corporation. (Miller v. State, 82 U. S., 478; Mayor et al. v. Norwich, 109 Mass., 103; Ry. Co. v. Board, 35 Wis., 257; Tomlinson v. Jessup, 82 U. S., 454; Gas Light Co. v. Hamilton, 146 U. S., 258; Bank v. Owensboro, 173 U. S., 636; R. R. Co. v. Maryland, 187 U. S., 258; Bank v. Daviess Co., 39 S. W., 1030; Jackson v. Walsh, 23 Atl., 778.)

Some query has been entertained as to the effect of the vote of the people locating the college on the power of the

Legislature to repeal the Agricultural College act.   Numerous cases have arisen "where an office has been created" by the Legislature and the people have thereupon elected a competent person to fill the office, and afterwards the Legislature has repealed the law establishing the office and thus destroying the office.   Not only does the question seem to us the same as the one raised here, but the courts use the same phraseology.   They put the ground of repeal upon the "public agency" idea and no court has held that the vote of the people prescribing who should fill the office in any way affected the question, but the office might be destroyed at any time, even during the incumbency of one so elected by the people.   (State v. Douglas, 26 Wis., 428; Conner v. Mayor, 5 N. Y., 285; Bruce v. Pittsburgh (Pa.), 30 Atl., 831; State v. Dolan (Mo.), 6 S. W., 366; *In re* Registers, 117 Mass., 603; State ex rel. v. Hyde (Ind.), 28 N. E., 196; Blackmore v. Russell (Ga.), 33 S. E., 444; Newton v. The Commissioners, 100 U. S., 548; Dallas v. Griffin, 43 S. E., 758.)

*William E. Mullen, Attorney General,* and *T. F. Burke,* also appeared for the respondent and submitted oral arguments in support of the demurrer.

*Chatterton, Preston & Coolidge* and *S. T. Corn,* for the relators, in opposition to the demurrer.

The Act of Admission, being the solemn compact between the state and the government, its terms are of controlling force in construing any dubious provisions of the State Constitution.   Section 10 of said Act of Admission grants 90,000 acres of land for the support of an Agricultural College in the state.   In Section 11 the following grant of land is made:   For state, charitable, educational, penal and reformatory institutions, 260,000 acres.   By Section 8 a grant of lands was made for university purposes. Thus Congress expressly recognized the University and grants and donations for university purposes, and expressly recognized the Agricultural College to be thereafter estab-

lished, and granted to the state 90,000 acres of land for the use and support of the same. And the state, in accepting the grant for the use and support of an Agricultural College, solemnly obligated itself to establish a separate Agricultural College.

The state further ratified its obligation contained in the Act of Admission in the following language contained in Section 1 of Article 18 of the Constitution: "The State of Wyoming hereby agrees to accept the grants of lands heretofore made, or that may be hereafter made by the United States to the State for educational purposes, for public buildings and institutions and for other objects and donations of money with the conditions and limitations that may be imposed by the acts of Congress, making such grants or donations."

The constitution cannot by the most strained construction be construed to give to the University or its Agricultural Department a vested right, title and interest in the "Morrill" and "Hatch" funds. It plainly has reference to the grant of lands in the other acts of Congress for university purposes, and future donations made specifically to the state for university purposes. The provisions of the Hatch and Morrill laws negative the idea that they are given for the benefit of the University, or that said institution shall acquire a vested and permanent right and title to said appropriations. It is important to observe that the University, although organized in 1886, at the time of the adoption of the constitution was not receiving or making any claim to the Hatch and Morrill funds, and never did receive or lay any claim thereto until after the passage of the act providing for the establishment of the Wyoming Agricultural College in 1891.

The legislative construction placed on the tenure of the University to these funds is of almost controlling force. In all the legislation in regard to said funds, the right of the University as the recipient therefor is regarded as a transient one, to continue only until a separate agricultural

college should be established. The objects and purposes for which the University was organized as expressed in the statute creating it does not bring it within the qualifications required by said acts of Congress. No agricultural or mechanical department is provided for in the act. The constitutional reservation of the right to repeal charters of corporations applies solely to corporations of legislative creation and to amendments and repeals of laws affecting all corporations alike, and does not extend to corporations established under a constitutional provision by the vote of the people. The right to repeal the charter of a private corporation solely of legislative creation would, we believe, be subject to the limitation that such repeal shall not impair the obligations of contracts, or divest vested property rights. It could not be made to apply to a special charter like that of the Wyoming Agricultural College in any event unless such right was reserved in the charter itself. The Wyoming Agricultural College was not and could not be a burden to the state, for there is no obligation on the part of the state to support it. The public welfare could never demand that an educational institution of this kind should be destroyed and its private funds confiscated to the state. But in any event the reservation to repeal the corporation laws must be construed in the light of Section 2 of Article 10 of said Constitution, and does not give the Legislature power to single out and repeal the charter of a particular corporation in the absence of wilful neglect or abuse of its charter.

The effect of the reservation to alter, amend or repeal a charter has been construed by the Supreme Court of the United States in several cases, as follows: A power reserved to the Legislature to alter, amend or repeal a charter authorizes it to make any alteration or amendment of a charter granted subject to it, which will not defeat or substantially impair the object of the grant, or any rights vested under it and which the Legislature may deem necessary to secure either that object or any public right.

(R. Co. v. Bristol, 151 U. S., 567; Looker v. Maynard, 179 U. S., 52.)  Vested rights cannot be destroyed or impaired under a reserved power.  (Holyoke Co. v. Lyman, 15 Wall., 519.)  When, under power in a charter, rights have been acquired and become vested, no amendment of the charter can take away the property or rights which have become vested under the legitimate exercise of the powers granted.  (Miller v. State, 15 Wall., 486; Comm. v. Essex Co., 13 Gray, 239; Durfee v. Railroad, 5 Allen, 236; Roxbury v. Railroad, 6 Cushing, 424; Detroit v. Plank Road Co., 43 Mich., 140.)  It is not necessary to the conclusion that a body exercising corporate powers is in the rightful exercise of them, that the body should have been declared a corporation by the Legislature in expressed words.  (10 Cyc., 202, 1098.)  The power to sue and be sued is, by the principles of the common law, an incident of every corporation.  The whole question in such cases is whether the party suing or being sued is a corporation.  (10 Cyc. 1331, 1098.)

The trustees of the college were vested with absolute power to acquire, hold and dispose of real and personal property, and the right to sue and be sued is necessarily implied.  A State official may be compelled by writ of mandamus to perform a ministerial duty.  (State v. Herd, 18 So. 746; State v. Jumel, 30 La. Ann., 863; Marbury v. Madison, Cranch, 137; Wendall v. U. S., 12 Pet., 608; Board v. McComb, 92 U. S., 541; High on Ex. Leg. Rem., Secs. 10, 105; State v. Gambel, 13 Fla., 9; Bryan v. Cattell, 15 Ia., 538; Turner v. Maloney, 13 Cal., 621; Goodrich v. Guthrie, 17 How., 309; United States v. Goodrich; Brashear v. Mason, 6 How., 692; Marberry v. Madison, Cranch, 167; United States v. Shurz, 102 U. S., 378; Butterworth v. U. S., 112 U. S., 50; U. S. v. Black, 128 U. S., 40; Cohens v. Va., 6 Wheaton, 264.)

The fact that the prayer is too broad will not defeat the relator's right entirely, but he will be granted such relief as he is entitld to.  (13 Ency. Pl. & Pr., 684; Com'rs v. Jackson, 165 Ill., 17; Satterwhites v. Stole, 142 Ind., 1; Ells-

worth v. Borwart, 95 Ia., 108; People v. Queens Co., 142 N. W., 271; State v. Crites, 48 St., 142; Smith v. Lawrence, 2 S. Dak., 188; Fisher v. Charleston, 17 W. Va., 628.)

A corporation may be private and yet the act or charter contain provisions of a purely public character introduced solely for the public good. A public corporation is one that is created for political purposes with political powers to be exercised for purposes connected with the public good in the administration of civil government where the whole interests belong to the government. (State v. Carr, 111 Ind., 355; Downey v. Bd., 129 Ind., 443; Bd. v. Bakewell, 122 Ill., 339; Trustees v. Woodward, 4 Wheat., 523; Allan v. McKean, 1 Sumner, 276; Regents v. Williams, 9 Gill & J. (Md.), 365; Bank v. Bank., 9 Wheat., 907; Bank v. Gibbs, 3 McCord, 226; Sclinas v. Ag. Col., 60 Vt., 249; Bd. v. Grenbaum, 39 Ill., 610; Cleveland v. Stewart, 3 Ga., 283.) The Wyoming Agricultural College although not specifically designated as a corporation by the act providing for its establishment is still a distinct legal entity capable of taking by bequest. (Est. Royer, 44 L. R. A., 364.)

Even municipal corporations are deemed private corporations with respect to the ownership and control of private or corporate property as distinguished from property devoted strictly to public or governmental uses. (Bullmaster v. St. Joseph, 70 Mo. App., 60; Whitfield v. Carrolton, 50 Mo. App., 98; Milburn v. Orange, 55 N. J. L., 254; Bailey v. N. Y. 3 Hill, 531; Bloodgood v. R. R. Co., 18 Wend., 9; Oliver v. Worchester, 102 Mass., 489; MaCauley v. New York, 67 N. Y., 60; Memphis v. Kimbrough, 12 Heisk, 133; Sayd v. New York, 5 N. Y., 369, 55 Am. Dec., 347; Bailey v. Mayor, 38 Am. Dec., 669; Rochester &c. Co. v. Rochester, 53 Am. Dec., 316; Holland v. San Francisco, 7 Cal., 376; Stackhouse v. Lafarette, 26 Ind., 17; Buckmeyer v. Evansville, 29 Ind., 187; People v. Mayor, etc., of N. Y.,

62 N. Y., 164; Same v. Same, 32 Barb., 116; Milwaukee v. Milwaukee, 12 Wis., 111.)

The pretended repealing act of the Legislature of Wyoming, passed in 1905, is unconstitutional, null and void, because: (a) It contravenes Section 23 of Article 7 of the Constitution, which provides that the Legislature shall not locate any public institution other than those specifically mentioned in said Section, except under general laws and by vote of the people. (b) It attempts to nullify and destroy the sovereign act and will of the people as expressed in said Constitution, and at the polls locating said Agricultural College at Lander. (c) It impairs the obligation of contracts and divests property rights, and is in contravention of Section 10 of Article 1 of the Federal Constitution, and of Section 36 of Article 1 of the State Constitution.

Legislature has no power to repeal an institution created by vote of the people. (State v. Hastings, 12 Wis., 52; Van Steenwich v. Sackett, 17 Wis., 665; Lieb v. Comm., 9 Watt. (Pa.), 226.)

The fund was provided by the United States and was ready to be paid over to an agricultural college when one should be established. The Legislature provided it, but could not locate or fully establish it without a vote of the people. It is evident it was provided for the purpose of utilizing the donation from the government and private donations. It was submitted to the people and by them located. The college has acquired property of its own and as such owner of property is a private and not a public or political corporation. If this repealing act has any effect upon it as a private corporation, or the effect, at least, which seems to be insisted upon by the defendant, it is to destroy its location at Lander and relocate it at Laramie without any vote of the people and in violation of the Constitution, confiscate the property of the Lander College and turn it over to the college as relocated at Laramie. This they cannot do.

If the Legislature may at any time repeal an act providing for the establishment of the Agricultural College after the same has been located, they may immediately pass a new act again providing for the establishment of the college and again submit it to the people; and if the location does not suit the Legislature, they may repeat the process and thus forever defeat the will of the people as to its location. In this case they attempt to go even further and relocate it themselves at Laramie. They have already by legislative act declared the funds of the Government shall go to the University temporarily. By destroying the institution at Lander, they made the appropriation of the Government funds to the University permanent and thus by indirection, located the College at the University without any vote of the people and in violation of the Constitution. It seems to be maintained by counsel that while the effect of the repealing act is to destroy the institution and abolish the office of the trustees yet the location is unaffected; but to treat the act of the people, the location, as still in force, while the institution located is destroyed, is absurd.

The constitutional prohibition that the Legislature shall not locate any public institution, other than those specifically mentioned except under general laws and by vote of the people, carries with it by necessary implication the prohibition that such other public institution when so located by the vote of the people shall not be removed or destroyed except by the people. It was the sovereign act of the people under and in pursuance of a constitutional requirement which created the Wyoming Agricultural College and endowed it with all its life, force and vitality. Said repealing act attempted to destroy not only the location but the very life of the College, thereby violating the will and act of the people as expressed, not only in their constitution, but at the polls. Although the Wyoming Agricultural College may be deemed for certain purposes a public institution, the Legislature has plainly ear-marked it with many of the powers and characteristics of a private or quasi public

corporation. The act providing for its establishment expressly provides that the trustees shall have the power to take and hold for the use and benefit of said College any real or personal estate and to dispose of the same in such manner as they may deem most conducive to the interests of said College, and to expend any and all income that may be placed under the control of such board by donations or by law or otherwise in such a manner as shall best promote the interests and prosperity of the said institution; and further provides that in the management and application of any property real or personal, granted, devised or bequeathed for the use of said Agricultural College, or the proceeds thereof, the trustees shall conform to the will and directions of the donor thereof, if any such directions shall have been connected with such grant, devise, bequest or donation, thereby investing said institution in these particulars with powers strictly of a private character, and holding out a guaranty of good faith and inviolability to those whom local pride or interest might prompt to bestow valuable gifts and financial assistance upon said institution, and thereby creating, especially after private donations have been made specifically to said institution as located, on the faith of the charter, with expressed directions as to how said donations should be expended, a binding contract between the State on the one hand, and said institution and said donors on the other, based upon a valuable consideration; a contract on the faith of which real and personal property has been donated to said institution; and for that reason the pretended repealing act is void. (Trustees v. Woodward, *supra;* Louisville v. Univ., 54 Ky., 642; Allen v. McKean, 1. Sumner, 276; Regents &c., v. Williams, 9 Gill & J., 365; U. S. v. Bank, 9. Wheat., 907; Downing v. Board, 12 L. R. A., 664; Board v. Blackwell, 10 N. E., 378.)

The State Treasurer in receiving and disbursing said funds donated by Congress acts as the agent of both the State and the Government and in a purely ministerial ca-

pacity.    The act providing for the establishment of the
Wyoming Agricultural College is in the nature, and has the
full force and effect, of an expressed direction by the Leg-
islature to said Treasurer to pay said Morrill appropria-
tion to said College when the same shall be located by a
vote of the people; especially so when construed in con-
nection with Section 488 of the Revised Statutes which
limits the right of the University to the funds until such
time as there may be established a separate agricultural
college.

It is alleged in the petition and admitted by the demur-
rer that the principal object of the University is not now
and never has been instruction in agriculture and the me-
chanic arts.    Section 4 of the Act of Congress of 1862, as
amended in 1883, clearly indicates that the purpose of the
appropriation is to sustain an institution whose leading ob-
ject shall be to teach agriculture and the mechanic arts,
and that the Legislature is to prescribe methods for pro-
moting not only a liberal but a practical education in the
branches taught.    And it needs no argument to demon-
strate that a practical education in agriculture is impossi-
ble without having at hand opportunity to cultivate the
soil in a locality and at an altitude where the cultivation
and maturing of agricultural products is reasonably prac-
tical.

By the Agricultural College act, the Legislature deter-
mined that a practical education in agriculture was not prac-
ticable at an altitude greater than 5,500 feet.    The determina-
tion of that question was within the scope of their author-
ity; it was a purely legislative question, and the courts have
no authority to review or revise the legislative decision and
determination upon it, or to substitute their own judgment
for that of the Legislature.    (Cooley Const. Lim., 167 *et
seq.*)

POTTER, Chief Justice.

This is a proceeding in mandamus commenced in this court in the name of the State, on the relation of the Wyoming Agricultural College, and Matt Borland and others as trustees of said college, against William C. Irvine, as State Treasurer. The object of the suit is to require the State Treasurer to pay to the Treasurer of said college, located at Lander, Wyoming, certain funds, alleged to be in the hands of said State Treasurer and to have been received for the benefit of said college.

An alternative writ of mandamus was issued in accordance with the prayer of the petition, and the cause has been heard upon a demurrer filed on behalf of the respondent. The demurrer states three grounds, viz: (1) That the petition does not state facts sufficient to constitute a cause of action in favor of the plaintiff against the defendant. (2) That the Wyoming Agricultural College is without legal capacity to sue. (3) That the other relators, as trustees of the Wyoming Agricultural College, are without legal capacity to sue.

The constitution declares that the Supreme Court shall have original jurisdiction in *quo warranto* and mandamus as to all state officers. (Art. 5, Sec. 3.) By statute, mandamus is defined as a writ issued in the name of the state to an inferior tribunal, a corporation, board or person commanding the performance of an act which the law specially enjoins as a duty resulting from an office, trust or station. (R. S. 1899, Sec. 4194.)

The petition sets out the following acts of Congress: First, the act of July 2, 1862, granting certain lands or land scrip to the several states, and providing that the proceeds thereof shall be invested to constitute a perpetual fund, and the interest inviolably appropriated by each state taking or claiming the benefit of the act "to the endowment, support and maintenance of at least one college where the leading object shall be without excluding other scientific and classical studies, and including military tactics, to

teach such branches of learning as are related to agriculture and the mechanic arts, in such manner as the Legislatures of the states may respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life." (12 Stat. L., 503-505; 22 Stat. L., 484; 2 Fed. Stat. Ann., pp. 850-853.) Second, the act of August 30, 1890, providing that there shall be appropriated, out of any money arising from the sales of public lands, to each state and territory "for the more complete endowment and maintenance of colleges for the benefit of agriculture and the mechanic arts" then established or which might be thereafter established, "in accordance with an act of Congress approved July second, eighteen hundred and sixty-two, the sum of fifteen thousand dollars for the year ending June thirtieth, eighteen hundred and ninety, and an annual increase of the amount of such appropriation thereafter for ten years by an additional sum of one thousand dollars over the preceding year, and the annual amount to be paid thereafter to each state and territory shall be twenty-five thousand dollars to be applied only to instruction in agriculture, the mechanic arts, the English language and the various branches of mathematics, physical, natural and economic science, with special reference to their applications in the industries of life, and to the facilities for such instruction." (26 Stat. L., 417; 2 Fed. Stat. Ann., 854-857.) Third, the act of March 2, 1887, entitled "An act to establish agricultural experiment stations in connection with the colleges established in the several states under the provisions of an act approved July second, eighteen hundred and sixty-two, and of the acts supplementary thereto." (24 Stat. L., 440; 1 Fed. Stat. Ann., 9.)

The petition then proceeds to allege the establishment of the relator, the Wyoming Agricultural College, by an act of the State Legislature approved January 10, 1891; the location of the college at the Town of Lander, Fremont County, by a vote of the people, to whom the question of location had been submitted as provided in said act, at the

general election held in 1892; the appointment soon there-
after of trustees for said college, by the Governor, by and
with the advice and consent of the Senate, as required by
said act; the organization of the Board of Trustees by the
election of a President, Secretary and Treasurer thereof;
the appointment of new trustees from time to time as re-
quired by law, and that such trustees duly appointed have
qualified and are acting as such. Then follows certain alle-
gations in substance as follows: That on June 17, 1903,
one Philip Wisser, a resident of Fremont County, in this
state, departed this life, having by his last will and testa-
ment devised and bequeathed to the said Wyoming Agri-
cultural College, located at the Town of Lander, all his
property, both real and personal, after the payment of
debts, etc., which property was, upon the settlement of the
estate of said decedent by the District Court in and for
Fremont County, on December 17, 1904, distributed, in ac-
cordance with said will, to the persons then constituting the
Board of Trustees of said college "in trust for the Wyo-
ming Agricultural College, which is located at Lander in
the County of Fremont and State of Wyoming, to be ex-
pended by such trustees and their successors in office for
the benefit of the Wyoming Agricultural College at Lander
in the County of Fremont and State aforesaid, according
to the terms of said last will;" that said estate so distrib-
uted consisted of $17,341.88 in money, and certain real es-
tate, described in the petition; that after receiving the
money coming to them from said estate as aforesaid, the
trustees of the college, on January 30, 1905, expended
nine thousand dollars thereof in the purchase of a site for
the college and an agricultural experiment station, at and
within the corporate limits of said town of Lander, said
site consisting of one hundred and sixty acres of land; that
the site was then and there designated by said trustees as
the site and location of and for the Wyoming Agricultural
College and Experiment Station in connection therewith;
and that "said trustees of the Wyoming Agricultural Col-
lege now hold the title to all of said last named real estate

upon the trust aforesaid for the use and benefit of the Wyoming Agricultural College."

It is alleged that after the purchase of the site aforesaid, and on January 31, 1905, the trustees of such college duly convened at Lander and adopted resolutions providing for opening said college, and thereby determined that the school year of the college should consist of three terms of three months each, the first three terms to commence respectively February 1, May 1, and August 1, 1905; that pursuant to such resolution, the college was opened for the enrollment and instruction of pupils on the site aforesaid, February 1, 1905, the board having at its meeting on the preceding day appointed and hired "professors of instruction in English, History, Civil Government, Mathematics, Agriculture, Horticulture and Irrigation," and that on February 2, 1905, a president and faculty for the institution, and a staff for the experiment station, were appointed and elected.

It is further alleged that said college has never received any appropriations, donations or other support from the Legislature, or from any other source, except from the estate of Philip Wisser, as aforesaid. The relators allege that said college is entitled to receive the appropriations to the state under the acts of Congress aforesaid, and that it is the only institution in the state so entitled; that the same have heretofore been paid to the University of Wyoming, which is located at Laramie, but that said University is not entitled to receive the present or future appropriations from that source.

The passage of an act by the Legislature approved February 7, 1905, is then averred, which purports to repeal the act of January 10, 1891, and all laws establishing the relator college, and said repealing act is alleged to be unconstitutional, null and void for the reason, (1) That it impairs the obligation of a contract, and (2) that it is an attempt to abolish an institution created by the people by their vote in locating it, pursuant to the act submitting the question of such location to them, and the constitutional

requirement that all public institutions, other than those expressly located by the constitution itself, shall be located only under general laws and by vote of the people.

The respondent is alleged to have in his possession the sum of twenty-five thousand dollars, derived from the United States for the year 1905, under the act of August 30, 1890, aforesaid, to which sum it is alleged the relator college is "legally, equitably and justly entitled;" that it requires said amount "in the maintenance and support of its department of instruction in agriculture and mechanic arts;" that the State Treasurer refuses to recognize its right to such fund, but asserts that the sum belongs to the University of Wyoming, and will pay the same to said University, unless otherwise directed by this court. The respondent is also alleged to have in his possession, or loaned under his direction, permanent funds amounting to $20,415.34 derived from sales of land and land scrip under said acts of Congress which funds are known and designated as the "Agricultural College Permanent Fund of 1903," and "The Agricultural College Permanent Land Fund;" that the relator college is legally entitled to all interest upon said funds, but the said respondent denies the relator's right thereto, and asserts that the same belongs to the said University, and will pay the same to said University, which it is alleged will be in violation of the said acts of Congress and the rights of the Wyoming Agricultural College.

The prayer of the petition is that a writ of mandamus issue commanding the respondent, as State Treasurer, to pay to the treasurer of the relator college, (1) the said sum of $25,000, received from the United States as the 1905 appropriation under the act of August 30, 1890; (2) all future appropriations received by him under said act; (3) all installments of interest now or hereafter due and payable on the permanent funds aforesaid, received and loaned under the said acts of Congress of 1862 and 1890; and (4) all funds, together with interest thereon, now in re-

spondent's possession, derived under the act of Congress of 1887 aforesaid. There is, however, no allegation that the respondent has received or has in his hands any funds under the said act of 1887, or that he has any duty whatever to perform as to those funds. The appropriations to the state under that act are not therefore involved in the case, and will not be specially considered.·

The demurrer here is understood by counsel, correctly we think, to raise every question necessary to a determination of the right of the relators to the funds in controversy. As the petition is, in some particulars, argumentative, and contains a statement of some facts of at least doubtful materiality, and, in addition to allegations of fact, embraces a recital of certain acts of Congress and the State Legislature, with allegations regarding the construction to be given those acts, it is proper to allude to the principle that, while a demurrer admits the truth of the material allegations of fact in the pleading demurred to, it does not admit arguments, legal conclusions or inferences not supported by the facts and circumstances therein set forth, nor the construction of statutes, nor facts that are immaterial or against common knowledge. (Ricketts v. Crewdson (Wyo.), 80 Pac., 1; 6 Ency. Pl. & Pr., 397; 13 id., 700.) We are not bound, therefore, by the construction placed by the petition upon the several legislative enactments involved, nor the conclusions therein alleged predicated upon the facts and the statutes aforesaid; but are at liberty and it is our duty to ascertain the proper construction of such laws, and their effect upon the claimed right of the relators. It is admitted of course that the respondent, as State Treasurer, has in his hands the various funds as alleged in the petition, and that he claims to hold them for the State University, and refuses to pay them to the relators or their treasurer. And it is likewise admitted that such funds were derived under the acts of Congress of 1862 and 1890 respectively. We are to inquire therefore whether upon the facts as controlled by the law govern-

ing the use of the funds in question the relators have shown themselves, or the college in whose behalf the suit is brought, to be entitled to them, and the relief prayed for. It should be added that a demand for the payment of the moneys to the treasurer of the relator college is alleged.

In 1886 the Territorial Legislature provided for a commission to procure a site at or near Laramie for a University building, and to erect such building, and authorized the issuance of the bonds of the Territory to obtain the money therefor. By the same act it was provided: "There shall be established in this Territory an institution under the name and style of 'The University of Wyoming,' to be located in or near the City of Laramie. * * * * · The objects of such University shall be to provide an efficient means of imparting to young men and young women, on equal terms, a liberal education and thorough knowledge of the different branches of literature, the arts and sciences, with their varied applications." (Rev. Stat. 1887, Secs. 3698, 3699.) The government of the institution through trustees to be appointed by the Governor, with the advice and consent of the Senate, was provided for, the powers of the trustees defined, and an annual tax upon all taxable property of the Territory was required to be levied to provide an income for the University. (Id. Secs. 3700-3716.) The Legislature of the Territory that convened in 1888 authorized an additional issue of territorial bonds to complete the University building, increased the rate of the annual tax for its support, and made an appropriation out of the funds then in the treasury for the same purpose. (L. 1888, pp. 62, 63.)

The Territory was admitted into the Union as a state July 10, 1890, under a constitution which had been framed in September, 1889, and had been submitted to and adopted by the people in November, 1889. That instrument contains the following material provisions:

"The Legislature shall provide for the establishment and maintenance of a complete and uniform system of pub-

lic instruction, embracing free elementary schools of every needed kind and grade, a university with such technical and professional departments as the public good may require and the means of the state allow, *and such other institutions as may be necessary.*"   (Art. VII, Sec. 1.)

"The establishment of the University of Wyoming is hereby confirmed, and said institution, with its several departments, is hereby declared to be the University of the State of Wyoming.    All lands which have been heretofore granted or which may be granted hereafter by Congress unto the University as such, or in aid of the instruction to be given in any of its departments, with all other grants, donations, or devises for said University, or for any of its departments, shall vest in said University, and be exclusively used for the purposes for which they were granted, donated or devised.    The said lands may be leased on terms approved by the land commissioners, but may not be sold on terms not approved by Congress."    (Art. VII, Sec. 15.)

"The University shall be equally open to students of both sexes, irrespective of race or color."   (Sec. 16.)   "The Legislature shall provide by law for the management of the University, its lands and other property by a Board of Trustees, consisting of not less than seven members, to be appointed by the Governor by and with the advice and consent of the Senate, and the President of the University, and the Superintendent of Public Instruction, as members *ex officio,* as such having the right to speak, but not to vote.    The duties and powers of the trustees shall be prescribed by law."   (Sec. 17.)

"The Legislature shall have no power to change or to locate the seat of government, the state university, insane asylum, or state penitentiary, but may after the expiration of ten years after the adoption of this constitution, provide by law for submitting the question of the permanent locations thereof, respectively, to the qualified electors of the state, at some general election, and until the same are

respectively and permanently located, as herein provided,. the location of the seat of government and said institutions shall be as follows:  *  *  *  The State University shall be located at the City of Laramie, in the County of Albany.  *  *  *  *  *The Legislature shall not locate any other public institutions except under general laws, and by vote of the people."* (Sec. 23.)

At the first session of the State Legislature the law relating to the objects of the University was amended so as to read as follows:

"The objects of such Uinversity shall be to provide an efficient means of imparting to young men and young women, without regard to color, on equal terms, a liberal education, together with a thorough knowledge of the various branches connected with the scientific, industrial and professional pursuits. To this end it shall embrace colleges or departments of letters, of science, and of the arts, together with such professional or other departments as in course of time may be connected therewith. The department of letters shall embrace a liberal course of instrucion in language, literature and philosophy, together with such courses or parts of courses in the college or department of science as are deemed necessary. The college or department of science shall embrace courses of instruction in the mathematical, physical and natural sciences, together with such courses in language, literature and philosophy as shall constitute a liberal education. The college or department of the arts shall embrace courses of instruction in the practical and fine arts; especially in the application of science to the arts of mining and metallurgy, mechanics, engineering, architecture, agriculture and commerce, together with instruction in military tactics, and in such branches in the department of letters, as are necessary to a proper fitness of students for their chosen pursuits, and as soon as. the income of the university will allow, in such order as the wants of the public shall seem to require, the said courses in the sciences and their practical applications shall be ex-

panded into full and distinct schools or departments."
(Laws 1890-91, Ch. 75, Sec. 2; Rev. Stat. 1899, Secs. 486,
487.)

As above mentioned the act of Congress admitting Wyo-
ming into the Union as a state was approved and took ef-
fect July 10, 1890. The act of Congress of August 30 of
that year, which has been referred to as set out in the pe-
tition, provided that the first installment of fifteen thou-
sand dollars thereby appropriated to each state and terri-
tory should become due July 31, of the same year. Upon
the admission of the Territory to statehood, the act of July
2, 1862, became applicable to Wyoming, subject to its as-
sent and the conditions imposed by that act. The first
State Legislature convened November 12, 1890. In the
message of the Governor to that body it was said, in re-
lating the financial condition of the new state, that "the
University will, doubtless, succeed in obtaining $15,000
from the United States government for the present year
on account of agricultural college appropriation made by
Congress." Under the head of official reports, the Gov-
ernor stated that the trustees of the University, in a very
full report, note the progress of that institution. * * *
A desire is expressed for the United States appropriation,
payable annually, for agricultural and mechanical college,
and it is confidently claimed that the University can provide
the necessary instruction to earn and entitle it to the full
amount of appropriations granted by the United States."
The message further called special attention to the act of
Congress of August 30, 1890, and informed the Legisla-
ture that the Governor had applied, on the part of Wyo-
ming, for the installment then due, to be paid into the
state treasury for the use of the University; that it would
be necessary for the Legislature to assent to the provisions
of the law in order for the state to avail itself of the fund;
and it was suggested that "it may be advisable not to cre-
ate a new institution, which will draw appropriations di-
rect from the state treasury for erection, establishment or

maintenance, until we shall have recovered from the extraordinary expenses made necessary at this time by causes mentioned elsewhere in this message."

At that session the Legislature passed an act assenting to the act of Congress of August 30, 1890. Said act reads as follows:

"Sec. 1. The University of Wyoming having been designated by the Secretary of the Interior as the proper institution to receive and expend the moneys appropriated by an act of Congress, approved August thirtieth, eighteen hundred and ninety, entitled 'An act to apply the portion of the proceeds of the public lands to the more complete endowment and support of the colleges for the benefit of agriculture and the mechanic arts, established under the provisions of an act of Congress, approved July second, eighteen hundred and sixty-two,' until such time as there may be an agricultural college established in this state, separate and apart from said University of Wyoming, assent is hereby given to all the terms and conditions of the said act of Congress and the grants of money authorized and made by said act are hereby assented to and accepted by the State of Wyoming."

"Sec. 2. The Treasurer of the State of Wyoming is hereby designated as the proper officer to accept and receive said moneys so granted by said act of Congress, and to disburse the same in accordance with the provisions of section two of the said act of Congress." (Laws 1890-91, Ch. 74; Rev. Stat. 1899, Sec. 499.)

Chapter 75 of the published laws of said session, is an act to amend certain provisions relating to the University. Section 12 of that act provides for an annual state tax for the support of said institution, and section 13 contains a recital in the same words as those contained in section 1 of the act above quoted, following which recital the section reads: "Assent is hereby given to all the terms and conditions of said act of Congress, and grants of money authorized and made by said act, by the act of March 2, 1887,

relative to the establishment of agricultural experiment stations, or any other act for like purposes, are hereby assented to and accepted by the State of Wyoming. Except where other designation is made by Congress, all monies granted or donated by Congress in aid of scientific instruction or experimentation, and set apart by the Legislature for such use by the University of Wyoming, shall be accepted and received by the State Treasurer, and by him placed at the disposal of the Board of Trustees of the said University by transfer to the treasurer of said board, for disbursement in accordance with the provisions of the act or acts of Congress aforesaid." (Rev. Stat. 1899, Sec. 500.)

An act was passed by the same Legislature, approved January 10, 1891, providing for the establishment and location of the Wyoming Agricultural College. (Laws 1890-91, Ch. 92.) As the relators claim existence as a college, and trustees, respectively, under that act a somewhat extended reference to its provisions seems advisable. The first section provided: "There shall be established in this state 'The Wyoming Agricultural College,' which shall be located by a vote of the people as hereinafter provided, and which shall be a state public educational institution." The objects of the institution are stated in section two as follows: "The objects of said agricultural college shall be to provide an efficient means of imparting to young men and young women, without regard to color, on equal terms, a liberal education and a thorough knowledge of such arts and sciences as will aid in the prosecution of agricultural pursuits with their varied applications."

That act further provides that the government of the college shall be vested in a board of five trustees, to be appointed by the Governor, by and with the advice and consent of the Senate; that the term of office of said trustees shall be four years, except as otherwise provided; that at the next session of the Legislature after the location of the college it shall be the duty of the Governor to nominate, by

and with the advice and consent of the Senate, five residents of the state as members of the board, three for two years and two for four years, and thereafter at each session of the Legislature to nominate, and, by and with the advice and consent of the Senate, to appoint successors to such of said trustees whose terms of office have expired or will expire during such legislative session; and that any vacancy in the board shall be filled by appointment by the Governor until the next session of the Legislature. The board is given power by the act, (1) to elect one of its members president of the board, (2) to appoint a secretary and treasurer from among its members, and such other officers "as it may deem necessary for the good order and government of the said agricultural college, and to prescribe the duties and fix the compensation of all such officers."

(4) "To procure by purchase, donation or otherwise, in the name of the State of Wyoming, within or near the limits of the city, town or village chosen as the seat of said agricultural college, as hereinafter provided, a suitable site upon which to erect suitable, convenient and proper buildings for the said agricultural college and to superintend the erection of such buildings; *Provided,* that said trustees shall not purchase any site or contract for the erection of any building until the funds shall be in their hands with which to pay for the same."

(5) "To possess and use for the benefit of the said agricultural college the buildings and sites that may be provided therefor." (6) "To take and hold for. the use and benefit of the said agricultural college any real or personal estate, and to dispose of the same in such manner as they may deem most conducive to the interests of said agricultural college." (7) "To expend any and all income that may be placed under the control of such board, by donation or by law or otherwise, in such manner as shall best promote the interests and prosperity of the said institution." Further, to elect a president and faculty of the col-

lege, and prescribe the duties and salaries of professors, tutors and officers, and the course of study and discipline to be observed in said institution, and the price of tuition therein; and "to make all by-laws and rules necessary and proper to carry into effect the powers herein conferred."

Other provisions of the act that may become material are as follows:

"Sec. 12. The trustees of said institution shall provide for the tuition, free of charge, of such students from each county as may be selected and appointed by the Board of County Commissioners of such counties."

"Sec. 13. In the management and application of any property, real or personal, granted, devised or bequeathed to the use of said agricultural college, or the proceeds thereof, the trustees shall conform to the will and directions of the donor thereof, if any such directions shall have been connected with such grant, devise, bequest or donation."

"Sec. 17. A Board of Visitors for said agricultural college, to consist of three persons, shall be appointed biennially, at the commencement of the college year, by the Governor of the state. It shall be the duty of the Board of Visitors for said institution to make a personal examination into the state and condition thereof and all its affairs, twice at least in each year, and report the result to the Governor, suggesting such improvements as they may deem proper, which report shall be submitted to the Legislature at its next session. Such visitors shall receive no compensation for their services."

The act provided for submitting the question of the location of the college to a vote of the people at the general election to be held in November, 1892, and that the city, town or village receiving the highest vote as the seat of said college should be the permanent seat at or near which the same should be located. Candidates for the location were limited by the act to cities, towns or villages in the state, containing not less than one hundred inhabitants, and situated at an elevation above the sea level of not more

than fifty-five hundred feet; and it was provided that any and all votes cast for any city, town or village not eligible should not be counted. Provision was made for the nomination of candidates for the location in the manner provided by law for the nomination of candidates for public office.

It is alleged in the petition that the question of location was submitted in pursuance of the provisions of the act, and that the Town of Lander received the highest vote, and became thereupon the seat of said college. With the exception of those sections of the act relating to the submission of the question of location, the provisions were brought into the revised statutes of 1899, and are found in sections 504 to 519 inclusive. This particular institution does not appear to have been again mentioned in any act of the Legislature until the session that convened January 10, 1905. At that session an act was passed, approved February 7, 1905, entitled: "An act to repeal Chapter 92 of the session laws of the State of Wyoming of the years A. D. 1890-1891, being an act entitled, 'An act providing for the establishment of the Wyoming Agricultural College, and to provide for the location and government of the same, and for the instruction to be therein given, and for other purposes,' approved January 10th, A. D. 1891; and also so much of said act as is embraced in sections 504 to 519 both inclusive, of Chapter 2, Title 6, of the revised statutes, Wyoming, 1899, entitled: 'The Wyoming Agricultural College.'" Section one of the act so entitled provides that said act of 1890-1891 and the sections of the revised statutes 1899 containing its provisions, describing them as in the title, "be and the same are hereby repealed."

The agricultural college as established by the act of January 10, 1891, became, however, the fruitful source of legislative discussion and contest. It is a matter of public history, with which practically every citizen of the state must have been more or less familiar, that at the several sessions of the Legislature subsequent to the election of

1892, those interested in the promotion of the new institution persistently urged the enactment of laws appropriating money or levying taxes for the purpose of securing a site for the college, erecting the necessary buildings, and supporting it; but that the measures introduced to that end were repeatedly defeated, through the determined opposition of the friends of the University, and others interested in maintaining the integrity of the latter institution, and preventing the imperiling of its department of agriculture and mechanic arts supported largely by the generous bounty of the government. The biennial agitation of the question whether the two institutions should be maintained culminated in the repealing act aforesaid.

Counsel for the respondent have presented and argued several objections to the maintenance of this suit. It will not be necessary to consider all of them, but they may as well be briefly stated. It is urged that the relators are without capacity to sue, first, because neither the college nor the trustees are specially made a body corporate, or given power to sue or be sued, in the act establishing the college; and, second, whatever right to sue may have been granted or implied by the act of 1891, the repealing act of 1905 operates effectively at least to abolish the office of trustee and to deprive the college of the governing board. It is moreover contended that the repealing act is even more effective, and has abolished the institution itself that was created by the original act. It is also argued that the provisions of the act of 1891 for the location of the college were unconstitutional and void on account of the restriction upon the eligibility of candidates; that such candidacy was limited in effect to not more than six places in the state; and it is contended that no just or proper reason can be assigned for a restriction as to altitude or number of inhabitants in allowing the people to select a location for an agricultural college. Hence it is argued that, in fact, the college was not located by the people, since their choice was so unreasonably limited by the Legislature.

Counsel further assail the constitutionality of the entire act of 1891. In that connection it is strenuously argued that when the constitution of the state was framed and adopted, the university had been created, and, with it several departments, including an agricultural department, was in successful operation; and that, as said institution "with its several departments," is by the constitution itself confirmed and declared to be the State University, the Legislature is powerless to establish another university or to invest another institution with any of the functions of the then existing university. And the provision of the constitution declaring vested in the University all lands theretofore or to be thereafter granted "by Congress unto the University as such, or in aid of the instruction to be given in any of its departments, with all other grants, donations, or devises for said University, or for any of its departments," is contended to be broad enough to cover and include all the grants and donations under the acts of Congress in aid of colleges of agriculture and mechanic arts, and therefore to vest all such grants and donations in the University. The proposition that the repealing act annulled the institution is based upon the ground that it was a public institution if anything, and, if a corporation at all, a public corporation, and as such subject to the absolute will of the Legislature. Thus it will be observed that the arguments open a broad field of inquiry embracing a variety of questions.

On the other hand, counsel for relators insist that under section one of article seven of the constitution, the Legislature is granted express authority to establish any such educational institutions as it may deem necessary; that the Agricultural College in question was not only established in pursuance of constitutional authority, but, as required by the constitution, was located by the people; and having been so located, the act of the people in that respect cannot be overthrown by a repeal of the act authorizing such location. It is earnestly contended by counsel for relators that

the college was created by the people through their vote in locating it, by authority of the act submitting the question of location to them. It is therefore argued that the repealing act is void; first, because it attempts to abolish an institution created by the people; and, second, that the institution is, as determined by its granted powers, a private corporation, its charter constituting a contract, the impairment of which by legislative act is prohibited by both the State and Federal constitution. They further contend that the University is not a proper institution to receive and expend the government donations for the reason as argued, that its leading object is not instruction in those branches of learning related to agriculture and mechanic arts; that the statute designates that institution to receive such donations only until a separate agricultural college shall be established in the state; and that the relator college has been established as such separate institution, therefore entitling it to the benefit of the congressional grants in controversy. It is perhaps needless to add that counsel for relators maintain the constitutionality of the provisions of the act of 1891 for the location of the college, and that the restrictions were proper and reasonable.

It seems to be the theory of the relators that the relator college occupies the position of beneficiary of the grants of land and money under the aforesaid acts of Congress as a result of its establishment and location, and the commencement of its operations. It is not clear that the allegations of the petition show sufficiently, if that should be deemed essential, that the college has gone into such active operation that it possesses the necessary opportunities for expending the government money in the manner required by the restrictions placed upon such expenditure. The purchase of a site is averred, and the opening of a school two days thereafter upon the site; but we are left to surmise the erection or possession of appropriate buildings and the continuation of college instruction. But, assuming that the college is not subject to objection on any such ground,

either in fact or law, let us consider at the outset what the
right of the relators may be in the premises.  On their be-
half it is argued that the congressional grants of 1862 and
1890 run to the college or proper educational institution,
rather than to the state as such; that the State Treasurer
is merely the conduit for the transfer of the money ap-
propriated by the act of 1890 from the government to the
proper college; that the treasurer, in other words, is the
agent of the United States to pay the money to the bene-
ficiary.  That theory, in our opinion, is based upon a mis-
conception of the purpose and effect of the several acts of
Congress upon the subject.  It is not sustained by the lan-
guage of the acts, nor has it ever obtained the sanction of
the courts which have been called upon to consider and
construe those acts.  The grants are not to any particular
institution, but to the state.

Under the act of July 2, 1862, the lands or land scrip
were expressly granted to the several states; and the states
were required to pay out of their respective treasuries all
the expenses of management, superintendence, and taxes
from the date of the selection of the lands, previous to
their sales, and all expenses of the management and dis-
bursement of the proceeds, "so that the entire proceeds of
the sale of said lands shall be applied without any diminu-
tion whatever to the purposes" specified in the act.  Any
loss in the fund derived under either act of Congress is re-
quired to be replaced by "the state to which it belongs."
It is provided in the act of 1862 that "No state while in a
condition of rebellion  *  *  *  *  shall be entitled to the
benefit of this act," and that "No state shall be entitled to
the benefits of this act unless it shall express its acceptance
thereof by its Legislature."  By the act of 1890, the an-
nual appropriation is to be paid "to the State or Territorial
Treasurer, or to such officer as shall be designated by the
laws of such state or territory to receive the same."  In
the second section of that act it is provided that payments
of the appropriation "that shall become due to any state"

before the adjournment of the regular session of the Legislature meeting next after the passage of the act shall be made upon the assent of the Governor. Before any state can take the benefit of the acts it must, within the periods respectively provided in the act of 1862 as amended, express its acceptance thereof by its Legislature, and provide at least one college of the character therein required. No money can be paid out under the act of 1890 "to any state or territory for the support or maintenance of a college where a distinction of race or color is made in the admission of students." On or before July first in each year the Secretary of the Interior is required to ascertain and certify to the Secretary of the Treasury "as to each state and territory whether it is entitled to receive its share of the annual appropriation." If any appropriation be withheld the facts and reasons must be reported to the President, and "the state or territory" may appeal to Congress.

These and other provisions that might be referred to clearly show that the grants and appropriations are to the states, though they are severally charged with the important trust of applying the funds so derived solely and faithfully to the purposes set forth in the acts making the grants and appropriations. The treasurer is the agent of the state to hold and disburse the fund as directed by the laws or the proper authority of the state. It is the right and duty of the state to select or designate the institution to receive and expend the funds, and for the faithfulness of such expenditure the state is made responsible. The right to select the beneficiary should therefore not only naturally belong to the state; but if the state desires to retain the grant it must make such selection; and that duty is all the more imperative where there are two or more qualified colleges in the state claiming a share of the funds. In a matter of that kind the state can only act through its Legislature, unless indeed there should be a proper controlling provision on the subject in the constitution. One condition of the grant is that the state shall provide at least one college, within the period limited by the act of Congress,

"or," it is enacted "the grant to such state shall cease."
Where would the authority of the state to provide a col-
lege ordinarily reside, if not in the Legislature? Again it
is declared that the lands and moneys granted shall be "in-
violably· appropriated by each state" to. the endowment and
support of at least one college for the teaching of certain
branches of learning, "in such manner as the Legislatures
of the states may respectively prescribe." The act itself
therefore not only recognizes the authority of the State Leg-
islature in the premises, but expressly requires the money to
be appropriated for the specified objects in the manner pre-
scribed by the Legislature.

The case of Massachusetts Agricultural College v. Mar-
den, 156 Mass., 150, is an instructive one upon this sub-
ject. That was a mandamus proceeding to compel the
Treasurer and Receiver General of the State of Massachu-
setts to pay over to the treasurer of the petitioner a fund
received under the act of Congress of August 30, 1890.
The contest was really between the Agricultural College
and the Massachusetts Institute of Technology. The last
named institution had been made a party to the proceed-
ings, and it claimed a right to participate in the fund. It
was held that the act of Congress gave no preference to
agriculture over the mechanic arts; that it contemplated
the endowment of colleges already in existence as well as
those afterwards to be established; that the fund is not
necessarily for the benefit of only one college in each state;
and that the grant or donation is to the state to be paid out
by the State Treasurer only as directed by the Legislature.
The court said: "The money in the hands of the Treas-
urer and Receiver General is the property of the state, held
under the law for a particular use and no other. Whether
the state has or has not power to control it in his hands
otherwise than to direct the use of it in conformity with
the act of Congress, it is clear that neither the state nor
the respondent has a legal right to divert it, and that, if
there are different ways in which it may be used under the

provisions of the statute of the United States, the state alone, acting by its legislature, can choose between them." And again, "the appropriation by Congress was to the state, and the payment to the respondent was for the use of the state, and the only limitation on the right of the state is to use it for the more complete endowment and maintenance of a college, or of colleges, established in accordance with the act of 1862.  *  *  *  *  The Legislature should determine to which of the two claimants it will give the fund in the hands of the respondent, or whether it will give a part of it to one and a part to the other. The respondent has no right to pay it out until he is directed to do so by the state."

In the case of Brown University v. Rhode Island College of Agriculture & Mech. Arts, 56 Fed., 55, the question was directly considered whether the grant under the act of August 30, 1890, is to the state, or to the treasurer of the state, or to the college through him as a mere channel of payment. After referring to several provisions of the act, the learned judge, before whom the cause was heard said: "It seems to me very plain that these words import, on their face, a grant to the state, and, by consequence, a duty in the state to administer the grant for the prescribed purpose; and I am unable to see any consideration arising from the nature of the case, which should modify this plain import. The provisions as to payment to the treasurer and payment by him do not necessarily exclude the controlling action of the state.  *  *  *  *  The complainant contends that the treasurer, under the act of Congress, has the simple ministerial duty to pay over the fund to the treasurer of the Agricultural College. But here, it appears, are two corporations, each claiming to be the beneficiary. In order to determine between these conflicting claims, he must decide what action is necessary to constitute a beneficiary, and also whether such action has been in favor of each of the claimants. This decision seems to me appropriate for the state by legislative act, and not for an officer controlled

by judicial mandate. The state is to establish the beneficiary, to control its funds, to be responsible for its misdeeds and for its errors, if any there be, as to the application of the funds; and I find myself unable to resist the conclusion that, unless restrained by clear words or certain implication, the state has the sole right to ascertain in the beginning, and at each successive step, the identity of the corporation which it has so designated, and for which it is so responsible."

In Regents of the University v. Hart, 7. Minn., 72, concerning a somewhat similar question the court said: "The title to the lands reserved by Congress for the 'use and support of a State University,' is in the state, and not in the corporation, and all property acquired by the Regents, real and personal, with the fund placed at their disposal, is the property of the state, the corporation being merely a trustee or agent, with specified powers, to use it in a particular manner, for a given end."

Should it be conceded that, in case of a single institution in a state, and *that* a public institution, coming within the provisions of the congressional enactments, it might receive the fund without specific legislative direction, which, however, we are not ready to concede, it is plain that where there are two or more conflicting claimants, each possessing the requisite qualifications, it is the duty of the state acting through its proper authority, as a prerequisite to a disposition of the grants, to designate the beneficiary. (In re Agricultural Funds, 17 R. I., 815; State ex rel. v. Knowles, 16 Fla., 577; Yale College v. Sanger, 62 Fed., 177; State v. R. R. Co., 51 Miss., 361; Vincenheller v. Reagan (Ark.), 64 S. W., 278; People ex rel. v. Davenport, 117 N. Y., 549.)

That the University, as an institution, fulfills all the prescribed conditions upon which the funds are donated by the government cannot reasonably be doubted. It is an educational institution provided by the state. Though embracing several departments, its authorized courses of

study cover the branches of learning in aid whereof the donations are made; and it maintains a department or departments for the purpose of imparting instruction in those branches. Its continued enjoyment of the benefit of the donations renders it evident that it has been and is deemed a proper institution by the officers of the government in charge of the appropriations; and at the first session of the State Legislautre, that body, in the act accepting the grant, recorded the fact that the Secretary of the Interior had so designated the University. The law does not require that the "leading object" of the aided institution in its entirety, or as a complete institution, be the teaching of the branches of learning related to agriculture and mechanic arts. A university may and usually does embrace several colleges. Our statutes expressly declare that the State University "shall embrace colleges or departments of letters, of science, and the arts," that the "college or department of the arts shall embrace courses of instruction in the practical and fine arts; especially in the application of science to the arts of * * * * mechanics, engineering, architecture, agriculture and commerce, together with instruction in military tactics." It is sufficient if the aided institution maintains a college or department whose leading object is instruction in the prescribed branches, and applies the funds to the support of such college or department; and the institution will not be rendered incapable of appropriating the donations from the fact that a majority of its students are enrolled in other departments.

Until 1893 the donation to Connecticut was granted by the state to Yale College, in consideration whereof that institution equipped its department or college known as "Sheffield Scientific School." (Yale College v. Sanger, 62 Fed., 177.) In Rhode Island, Brown University was for a long time the beneficiary; in New Jersey Rutgers College. (Trustees &c. v. Morgan, 57 Atl., 250.) From the reports of the Commissioner of Education it appears that in at least twelve states the State University is the bene-

ficiary of the fund; and in several others the declared bene-
ficiary is the Department of Agriculture and Mechanic Arts
of the State University. We are unable to ascertain that
the propriety of such use of the fund has ever been ques-
tioned on the part of the government.

According to the report of the Secretary of the Interior,
dated November 29, 1904, the total attendance of students
in 1903 at the aided institutions was 50,799, of which num-
ber only 18,147 were enrolled in the departments or col-
leges of agriculture and mechanic arts; and of those stu-
dents more than ten thousand pursued some engineering
course, either mechanical, civil, electrical, mining, chem-
ical, railway, sanitary, textile or general engineering; more
than five hundred took the course in chemistry, 194 in
architecture, and 1,310 in general science; while but 2,337
were instructed in agriculture, 68 in horticulture and 66
in forestry. Reports of other years show a similar condi-
tion. Yet no intimation is contained in those reports that
the comparatively small number of agricultural students
indicates a misapplication of the funds.

The grants were intended to aid instruction in mechanic
arts as well as agriculture; and it would seem that stu-
dents in the former largely predominate throughout the
country. It was held in Rhode Island that a mere agri-
cultural school was not within the contemplation of the
acts of Congress making the grants, and a legislative act
was held invalid which attempted to divert the fund from
Brown University to such agricultural school. (*In re*
Agricultural Funds, 17 R. I., 815.) It might be seriously
doubted whether the declared objects of the relator college,
and the branches provided to be taught by its trustees as
alleged in the petition, include courses of study related to
the mechanic arts, though we do not propose to decide that
question; nor need we consider whether a college devoted
solely to instruction in agriculture to the exclusion of the
mechanic arts would meet the requirements of the congres-
sional grants.

The statutes of 1890-91 accepting the congressional grants, and assenting to the conditions thereof have been already quoted. (Laws 1890-1891, Ch. 74; Ch. 75; Sec. 13; R. S. 1899, Secs. 499-500.) Though the purpose to assent to the use of the funds by the University is rather inartistically expressed in those acts, such a purpose we think is evident; and said acts have undoubtedly been regarded by both the Legislature and executive branches of the state government as vesting the funds in the University, temporarily at least. By an act approved February 21, 1895, it was provided that appropriations for the University should specify the purposes for which the same were intended to be used, and it was declared that "such appropriations shall apply to and include all moneys received by the University from the United States for the endowment and support of colleges for the benefit of agriculture and mechanic arts, but moneys so received from the United States shall be appropriated, applied and used solely for the purpose specified in the acts of Congress regulating the same." (Laws 1895, Ch. 110, Sec. 1; R. S. 1899, Sec. 501.) By another act approved the same day the University was recognized as the institution to receive and expend the funds to be donated under the act of March 2, 1887, relating to agricultural experiment stations; and the duty of the University trustees in the premises was prescribed. (Laws 1895, Ch. 109; R. S. 1899, Secs. 502, 503.) By an act approved February 18, 1899, such trustees are required at the close of each scholastic year, to report in detail to the Governor the progress, condition and wants of the University, "and of each school or department thereof" * * * * "and such other information as they may deem important, or as may be required *by any law of this state, or of the United States.*" (Laws 1899, Ch. 51; R. S. 1899, Sec. 402.) At the same session an act was passed, Section one of which, with some amendments of 1901 and 1903 immaterial here, now reads as follows:

"During such time as the University of Wyoming shall be and remain the recipient of the funds, donated by the

United States government to the state, under the act of
Congress of March 2, 1887, establishing agricultural ex-
periment stations, and the act of Congress of August 30,
1890, applying certain moneys in aid of agricultural col-
leges, and all acts of Congress amendatory thereof and sup-
plemental thereto, the treasurer of the state shall invest
in the same class of securities, and at the same rate of in-
terest as provided by law for state funds, all moneys in
his hands, derived or arising from the sale of the lands, or
any of them, donated to this state by Congress for the use
and support of an Agricultural College; such securities to
be approved as other loans of state moneys are approved,
except that in addition thereto they shall be approved by
the President or Vice President of the Board of Trustees
of the State University : *Provided,* however, that no profit
or interest from such loans or investments shall be paid
over for the support of said institution, as hereinafter pro-
vided, until all loss or losses, if any, out of the principal
of said funds, shall be made good and restored out of said
profits and interest    *    *    *    *." (Laws 1899, Ch. 13,
Sec. 1; R. S. 1899, Sec. 520; Laws 1901, Ch. 14; Laws
1903, Ch. 42, Sec. 1.)    Section 3 of the act of 1899 afore-
said provided that the net interest and profit on such loans
and investments should be at all times available for use by
the trustees of the University for any purpose connected
"with the supporting and maintenance of the Agricultural
College at the University of Wyoming, not inconsistent or
in conflict with" the acts of Congress.   And by the act of
1903 all moneys arising from the rental of the Agricultural
College lands, the interest and profits upon the "Agricul-
tural College Permanent Land Fund," and the "Agricul-
tural College Permanent Fund of 1903" were appropriated
and made available for the support of "The Agricultural
College at the University."    (Laws 1903, Ch. 42, Sec. 3.)

In view of the foregoing provisions unmistakably requir-
ing the treasurer to pay over the funds in controversy to
the University, it is not perceived that he would be author-

ized to make a different disposition of them. Conceding that the use of the funds by the University was assented to only until the establishment of a separate agricultural college in the state, as argued by counsel, it would still require additional legislation to divert such funds from that institution. In the first place the act referred to does not provide that upon the establishment of a separate agricultural college it shall become the beneficiary of the grants; the act falls far short of bestowing the money upon such an institution when established. Even if binding upon future Legislatures, it would not authorize the transfer of the funds from the University without further legislation. But there is nothing in the nature of the subject that renders the act conclusive upon subsequent Legislatures. Who is to determine when such a college has been established within the meaning of the act? Evidently the Legislature has not deemed the relator college entitled to the money, although it was in terms established by the act of 1891, and located in 1892; for not once has it been recognized by legislative enactment, except by the act repealing the law under which it came into existence. And this brings us to the important question in the case, viz: The effect of the repealing act upon the right of the relators to the funds in controversy. It is contended by counsel for respondent that it disposes of every question in this case for the reason that it legislated out of existence the Wyoming Agricultural College and its trustees established by the act repealed. On the other hand it is urged that the repealing act is itself unconstitutional and void. (1) Because it violates the State and Federal constitution in that it impairs the obligation of a contract; (2) because it attempts to abolish an institution created by the people. These objections will be considered in their order.

First, it is contended that the Wyoming Agricultural College is a private corporation, and that its charter constitutes a contract, the annulment of which is prohibited by Section 36 of Article I., of the State Constitution provid-

ing that, "No *ex post facto* law, nor any law impairing the obligation of contracts shall ever be made," and also the Constitution of the United States, which provides: "No state shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts."

Since the decision of the Supreme Court of the United States in the great case of Dartmouth College v. Woodward, 4 Wheaton, 518, the principle announced in that case has been regarded as well settled in this country, that the charter of a private corporation is a contract within the meaning of the aforesaid clause of the Federal Constitution prohibiting the passage of state laws impairing the obligation of contracts. But the effect of the doctrine has in more recent years been largely overcome by the reservation in particular charters or in state constitutions or laws of the right of amendment or repeal. We have such a provision in our own Constitution: "All laws relating to corporations may be altered, amended or repealed by the Legislature at any time when necessary for the public good and general welfare." (Const., Art. X, Sec. 1.)

The principle laid down in the Dartmouth College case, and since maintained upon its authority, has been confined strictly to private corporations. In a later case before the same eminent court it was said that the principle "has no application where the statute in question is a *public law* relating to a *public subject* within the domain of the general legislative power of the state, and involving the *public rights* and *public welfare* of the entire community affected by it." The opinion then quotes the following from the opinion of Chief Justice Marshall delivered in the Dartmouth College case, which has been frequently quoted and referred to as a test for determining when the principle of the case is to be held applicable:

"That the framers of the constitution did not intend to restrain the states in the regulation of their civil institutions adopted for internal government, and that the instrument they have given us is not to be so construed may be

admitted. The provision of the constitution never has been understood to embrace other contracts than those which respect property, or some object of value, and confer rights which may be asserted in a court of justice  *  *  *  *. If the act of incorporation be a grant of political power, if it create a civil institution to be employed in the administration of the government, or if the funds of the college be public property, or if the state of New Hampshire, as a government, be alone interested in its transactions, the subject is one in which the Legislature of the state may act according to its own judgment, unrestrained by any limitation of its power imposed by the Constitution of the United States." Continuing the learned court say that the judgment in the Dartmouth College case proceeded upon the theory that the college was "a private eleemosynary institution, endowed with a capacity to take property for purposes *unconnected with the government,* whose funds are bestowed by individuals on the faith of the charter." After referring to the absolute power of the Legislature of a state over public offices, except as restrained by its own constitution, and the absolute character of the police power of the states, and that concerning municipal corporations, the opinion continues: "In all these cases, there can be no contract and no irrepealable law, because they are 'governmental subjects,' and hence within the category before stated. They involve *public interests,* and legislative acts concerning them are necessarily *public laws.* Every succeeding Legislature possesses the same jurisdiction and power with respect to them as its predecessors. The latter have the same power of repeal and modification which the former had of enactment, neither more nor less. All occupy, in this respect, a footing of perfect equality. This must necessarily be so in the nature of things. It is vital to the public welfare that each one should be able at all times to do whatever the varying circumstances and present exigencies touching the subject involved may require." (Newton v. Comm'rs, 100 U. S., 548.)

It is universally conceded that the charter of a public corporation is not a contract, and does not come within the clause of the constitution under consideration. It follows, therefore, that where a college is a public institution, or, if a corporation, a public corporation, its charter may be amended, altered or repealed at the pleasure of the Legislature. (7 Cyc., 285; 10 id., 157; 7 Ency. L., 637; 1 Thompson on Corporations, Sec. 25.) The chief difficulty in any case is to determine the class within which the particular institution falls. It is impossible perhaps to frame a comprehensive definition of a public corporation within the principle we are now considering. Counties, towns, and municipal corporations are common examples. They are governmental agencies vested with a limited governmental control over localities. But there are other institutions differing from them in character, but which are no less agencies of the government to carry out some matter of administrative concern. Judge Thompson in his work above cited, says: "Where the state pursues the policy of maintaining at the public charge a system of education, consisting of common schools, seminaries, colleges or universities, the corporations through the agency of which this is done are generally regarded as *public* corporations, whether created by general or special laws." Again, it is said: "Where universities and colleges are originated and prosecuted by legislative enactment, independent of private contributions, they are, as a rule, held to be *public* corporations, and their charters may be altered, amended or repealed by the Legislature at pleasure." (29 Ency. L., 321.) And the colleges, or universities founded and incorporated by the state to take and expend the aid of the National Government to instruction in agriculture and mechanic arts have usually been considered public corporations; and the same is true, as a rule, of state universities or other institutions of learning established by the state and controlled by it.

The Rhode Island College of Agriculture and Mechanic Arts was held by the Supreme Court of that state to be a

state institution; the court say: "Said college is a state institution; the title to the land, buildings, and other property is in the state; and the board of managers, although made a corporation, * * * * is but the agent of the state to carry out the purposes of the General Assembly in connection with the establishment and maintenance of the college." (Tucker v. Pollock, 21 R. I., 317.) In Utah, the Agricultural College which was established by the Legislature was held to be a public institution, and that the trustees thereof are officers within the meaning of the organic act of the Territory requiring all officers not otherwise provided for to be appointed by the Governor by and with the advice of the legislative council. From the opinion it appears that the law governing the institution bears in some respects a close resemblance to the act establishing the relator college. The court said: "The college was designed to be one of the permanent institutions of the Territory. It was to be under the control of trustees, who were to 'enact by-laws and rules for the regulation of all its concerns,' who, in addition to controlling all its financial affairs and business interests, were to appoint professors, teachers, and other officers and assistants of the college." The Oklahoma Agricultural and Mechanical College is held to be a public institution. "It seemingly needs no argument to show that the public educational institutions of a state are as much a part of its sovereignty as are its counties." (Oklahoma A. & M. College v. Willis, 6 Okla., 593; 40 L. R. A., 677.) The Supreme Court of Alabama, in a leading case on this subject, say: "While we would unhesitatingly maintain the doctrine that an act establishing a private corporation forms a contract by which the state is bound, we have no doubt but the President and Trustees of the University of Alabama constitute a public corporation, and that their charter may be altered, amended, or repealed by the General Assembly, at pleasure." And again, "What is the corporation, consisting of the President and Trustees of the University of Alabama,

but an instrument of government created. for its purposes."
(Trustees of Univ. v. Winston, 5 Stew. & Port., 17.)

The question arose in North Carolina whether the State
University was a public or private corporation. It had
been established by the state, upon public funds, though
private donations had been also invited, and received. The
court said: "But the court is further of opinion that the
University is a public institution and body politic, and,
hence subject to legislative control. It is admitted, and
the court is prepared to hold, that charters of corpora-
tions, founded by individuals, on their own funds, either
for their own emolument, or for the purposes of education,
or other general charity, are contracts of inviolable obliga-
tion. The admission and exclusion of members, the quali-
fication of directors or trustees, the mode of keeping up
their succession, and the government of such corporations,
are absolutely fixed by the charter, and can be only modi-
fied by the concurring will of the Legislature and the cor-
porations. The property of such a corporation, also is as
secure as that of an individual citizen. But the University
was founded by the state, on the public funds, and for a
general public charity. * * * * The trustees were not
of private appointment or designation; nor had they a fac-
ulty of keeping up the succession, of themselves: and no
person in particular derived any exclusive advantage from
the corporation. But, on the contrary, the election of trus-
tees has ever been by the Legislature, and their number,
more or less at different periods, as directed for the time
being, by the Legislature. There is no power, but their
own sense of the public interest, and their representative
responsibility, which can coerce the members of the Legis-
lature to keep up the succession by elections to fill vacan-
cies as they may occur; and therefore the corporation was
not only originally the creature of the Legislature, but it
is absolutely dependent on its will for its continuing exist-
ence. Hence, it seems to the court, that there cannot be an
instance of a corporation more exclusively founded by the

public, more completely the creature of public policy, for public purposes purely, than the University of North Carolina * * * *. It is true, that since the incorporation, there may have been donations to the college; but that would not alter the nature of the foundation, nor the character of the corporation. It is merely a political agent—an instrument of state; and it follows, that its organization, duration and government, its powers of acquiring property; and the disposition of property belonging to it—at all events, so far as it is of public endowment—are subjects for legislative regulation." (University v. Maultsby, 8 Ired. Eq. (43 N. C.), 257.)

An interesting case in Florida is quite in point. There, an act of the Legislature had established the Florida Agricultural College, and named the trustees of the institution. It had been established to secure the benefit of the act of Congress of July 2, 1862. The trustees selected a site for the college, having previously advertised for propositions from different localities desiring the location for contributions to aid in the construction of the college. Such advertisement resulted in a donation of over 2,000 acres of land, on condition of the location of the college at the place selected; and the construction of buildings was thereupon commenced. Subsequently another act was passed slightly changing the name of the college, changing the management by removing the trustees named in the former act and substituting others, and also authorizing a removal of the college to another place. The act required the treasurer of the former board to deliver the property thereof to the new trustees. A demand for such property having been refused, a proceeding in *quo warranto* was brought to test the right of the former trustees to continue to act as a body corporate. It was claimed by the respondents that the later act of the Legislature was void on the ground that the original institution was a private corporation, and also in consequence of the contract locating the college. The court said: "The corporation is itself founded by the state

through property derived from the Government of the
United States. These trustees are made by this legislation
the agents of the state to collect and disburse property ap-
propriated by the General Government to the state for a
public purpose. There is not and never was any private
property in the trustees in the funds. They were derived
from the government. The founder of this institution was
the government of the State of Florida, and the property
which constituted its basis was public moneys of the State
of Florida derived by it from the government of the United
States in trust for the establishment of an institution of
this character. It never was the purpose of the State of
Florida to give these trustees any private right to this
property. Throughout the whole legislation they are
shown to be simple public agents to manage a public prop-
erty. The only right they have to it is by legislation of the
state and every section of these acts shows that it was
founded by public funds and for a public purpose." And
the act, including the provision for removal, was held valid
notwithstanding the contract whereby the college had been
located between the trustees and the person donating the
lands as aforesaid. (State ex rel. v. Knowles, 16 Fla.,
577.) There are numerous other cases aptly illustrating
the distinction between a public and private institution, and
holding a college established by the state under acts more
or less similar to our own to be a public corporation or in-
stitution. (State v. Vicksburg etc. R. Co., 51 Miss., 361;
Dart v. Houston, 22 Ga., 506; Estate of Royer, 123 Cal.,
614; State ex rel., Little v. The Regents, etc., 55 Kan.,
389; 29 L. R. A., 378; Dunn v. Univ., 9 Oreg., 357; Neil v.
Trustees of Agr. & Mech. Coll., 31 O. St., 15; McCormick
v. Thatcher, 8 Utah, 294; Regents, etc., v. McConnell, 5
Neb., 423; State ex rel v. Regents, etc., 46 Neb., 373; So-
ciety, etc., v. State, 58 Neb., 447; State ex rel. v. McMil-
lan (N. Dak.), 96 N. W., 311; Henn v. State Univ., 22
Ia., 185; Weary v. State Univ., 42 Ia., 335; Thomas v. Ill.
Industrial Univ., 71 Ill., 310; Illinois Industrial Univ. v.
Champaign County, 76 Ill., 184; Head v. Univ., 47 Mo.,

220; Univ. v. R. R. Co., 76 N. Car., 103; Watson Seminary v. Pike Co. Court (Mo.), 50 S. W., 880; Board v. Phillips (Kan.), 73 Pac., 97.)

When we come to examine the act establishing the Wyoming Agricultural College, very little, if anything is to be found to characterize it as a private corporation, within the principle of the Dartmouth College case. In the first place, the act itself declares that the college shall be "A state public educational institution." It is not to be supposed that the Legislature was ignorant of the import of that term, nor of the existence of an important distinction between a public and private institution; especially in view of the constitution, which enjoins upon the Legislature the duty of establishing and maintaining, in addition to free elementary schools of every needed kind and grade, and a university, "such other institutions as may be necessary" to a "complete and uniform system of *public* instruction." (Art. VII, Sec. 1); and which prohibits any appropriation for "charitable, *industrial, educational* or benevolent purposes to any person, corporation or community not under the absolute control of the state." (Art III, Sec. 36.) By the unequivocal language employed the legislative intention to create, not a private corporation independent of the sovereign will of its creator, but a *public institution of the state* dependent at all times upon the Legislature, and connected with the administrative arm of the state government, as many other institutions, is we think beyond reasonable controversy.

Moreover, the remainder of the act bears out the legislative interpretation of the character of the institution thereby established, within the principle recognized by the overwhelming weight of authority. The trustees who constitute the governing board of the college are given fixed terms of office, and are to be appointed by the Governor, by and with the advice and consent of the Senate; and all vacancies are to be filled by the Governor, but only until the next session of the Legislature. Thus, the trustees are

granted no power to perpetuate themselves in office, nor to select their successors. They are required to procure a site for the college, but, whether the same be procured "by purchase, donation or otherwise," it is to be taken "in the name of the State of Wyoming." They are required to admit free of tuition such students as shall be selected and appointed by the County Commissioners of the several counties. The Board of Visitors are required to suggest in their report "such improvements as they may deem proper, which report shall be submitted to the Legislature at its next session." The diplomas to be issued by the faculty of the college in testimony of the literary honors and degrees conferred are required to be "under the seal of the state." A member of the faculty is rendered ineligible as a trustee. It is provided that no religious qualification or test shall be required of any student, trustee, president, professor, tutor, or officer of said institution, or as a condition for admission to any privilege in the same, and that no sectarian tenets or principles shall be taught or inculcated therein; a provision explainable only on the theory that it applies to a public institution. Finally the location of the institution is to be determined by a vote of the people of the state at a designated general election, and the qualification of candidates prescribed; the votes cast upon the question are to be canvassed in the same manner in all respects as provided by law for the canvass of votes cast for candidates for public offices voted for by the electors of the entire state—unusual and indeed unnecessary provisions if the college was not to be a *public* institution. "Public institutions" only are required to be located by vote of the people, and that provision is contained in a section of the constitution locating the seat of government, the University, the insane asylum, and the penitentiary, thus in a measure indicating what was meant by "public institutions."

It is true, as alleged in the petition, that the college has not received any public funds; that, from the time of its es-

tablishment until the distribution of the Wisser estate in December, 1904, it had not received funds from any source. But it is here seeking public funds, and as suggested in another connection, the Legislature has been importuned at every session to appropriate public funds for its benefit. Moreover, it is apparent that the institution was established in anticipation of its support through future appropriations of public money. Private donations to educational institutions in this state, especially public institutions, had not been common, and it does not appear that there had been any offer of such donations, or any proposition of private endowment of this institution if established. And had there been a desire on the part of some individual to endow such an institution he could have secured the incorporation of a private institution under the general laws, which seem to be ample for the purpose. If public aid was not contemplated it is difficult to account for its denomination as a state public institution. It is impossible to adopt any other view than that when the college was established it was the legislative design to create an institution to be maintained by public funds, though incidentally it might receive private assistance, without ignoring the history of the institution and the plain indication of the act establishing it. In the message of the executive to the Legislature of 1895, the result of the election locating the "State Agricultural College" was referred to; and it was suggested that "it will be necessary for the state to provide suitable land and buildings" for the college before the congressional funds could be available; and that "the inauguration of this educational institution presents one of the most important questions that will come before the Legislature, and one which may be perplexing." At that time the Governor clearly supposed that an institution had been provided for whose inauguration demanded the appropriation and expenditure of public funds. Though the act establishing the college was silent respecting reports by trustees, a general law was then in force requiring the governing board of every state institution to sub-

mit biennial reports to the Governor.  (Laws 1890, Ch. 5, Sec. 1; R. S. 1899, Sec. 180.)

The authority conferred upon the trustees "to possess and use for the benefit of the said Agricultural College the buildings and sites" provided therefor, and "to take and hold for the use and benefit of the college any real and personal estate," and "to dispose of the same in such manner as they may deem most conducive to the interests" of said college, is not inconsistent with the character of a public educational institution.  Such an institution must of necessity have a managing board, and discretion may well be granted the board in respect to the possession and disposition of property connected with the institution; though the property belong to the public.  The authority conferred, and the duty imposed under those provisions as well as under another soon to be mentioned relate to public matters, and the trustees in respect thereto are public agents. They are not vested with any private right or private property.  Similar powers have been conferred upon trustees of other state institutions of undoubted character as public institutions.  They were conferred by the same Legislature upon the trustees of the Hospital for Miners, the government of which institution has since been placed in charge of the State Board of Charities and Reform.  (Laws 1890-91, Ch. 81.)

Much reliance, in this connection, is placed by counsel for relators upon the provisions of section 13 of the act, which requires the trustees to conform to the will and directions of the donor of any property "granted, devised or bequeathed to the use of said Agricultural College." In relation to different provisions than those contained in other parts of the act in question, section 13 might have the result contended for, and, in doubtful cases, might perhaps be sufficient to turn the scale.  But it is found here in an act clearly establishing a public institution, as determined by every other provision of the act; and it must therefore, in our opinion, be construed in harmony with

such other provisions, and the legislative declaration found in the first section. It cannot be held therefore to be sufficient in itself to bring the college established by the act within the class of private corporations coming within the doctrine of the Dartmouth College case. Identically the same provision was contained in the act establishing the University; yet that institution was founded upon public funds, and the original act provided for issuing territorial bonds to provide means for the erection of the college buildings, and for an annual tax to provide an income for the institution. Indeed the act establishing the Agricultural College was modeled upon that creating the University as found in the Revised Statutes of 1887. With few exceptions the provisions of the two acts are the same, section for section; the notable exceptions being the name and objects of the institution, its location, and the absence in the later act of an appropriation for the benefit of the institution, and a provision in the former act authorizing the trustees of the University to incorporate under the general laws which is not contained in the later act. We have never heard it contended that the University was a private corporation, and not a public institution. Upon this point there are other requirements of our constitution that ought not to be ignored. The act of January 10, 1891, under which the relator college is claiming existence, would seem to be a special act in respect to the incorporation of the institution, at least if its incorporation is as a private institution. There was then and is now a general law in force permitting the incorporation of "a college, academy or other like institution for the education of youth," and if not comprehensive enough, or framed along sufficiently broad lines, that law is capable of amendment. The constitution provides that in several enumerated cases special or local laws shall not be enacted, and that "in all other cases where a general law can be made applicable no special law shall be enacted." (Art. III, Sec. 27.) And that: "The Legislature shall provide for the organization of corporations by general law." (Art. X, Sec. 1.) It might therefore be

seriously questioned whether as creating a private corporation the act would have been valid.

The fact that after the founding and establishment of a public state institution by legislative enactment, property may have been given, devised or bequeathed to it, or in trust for its benefit, has never been deemed sufficient to change the character of the institution, nor to deprive the Legislature of its plenary power of alteration, amendment or even repeal of the act. In such cases there is no contract relation between the state and the donor. Such donations must be presumed to have been made with knowledge of the public character of the institution and the power of the Legislature to control it. (University v. Maultsby, 8 Ired. Eq. (43 N. C.), 257; State ex rel. v. Knowles, 16 Fla., 577; Head v. University, 47 Mo., 220; Mead v. Ballard, 7 Wall., 290.) It would be strange indeed if the Legislature could be robbed of its control over a state institution, or if such an institution, without legislative consent, could be made over into a private corporation, through the mere voluntary act of a citizen or a number of citizens in making a gift to the institution.

In Head v. University, *supra,* it appears that a Board of Commissioners had been appointed in Missouri to locate the University, and receive grants of land and bids of money from certain named counties to secure the location of the institution. Private citizens of Boone County subscribed a large sum of money, and a certain college subscribed its buildings and apparatus to the building fund of the University; and in consideration thereof the University was located in Boone County. Yet the court said: "But these contributions to the building fund did not constitute the contributors founders of the University. Nor did the contributions alter the nature of the foundation, or change the character of the corporation. Between this and the Dartmouth College case and the cases following that decision there is a broad distinction—namely, the difference that exists between a public institution of the state and a private corporation."

The question as to whether an inviolable contract results from an invited or accepted private donation to a public institution is analogous to the question that arises upon the removal of a county seat where, in consideration of its previous location, private citizens or communities may have donated lands or money. It is well settled in the latter case that no such contract exists. (Newton v. Commissioners, 100 U. S., 548; Harris v. Shaw, 13 Ill., 463; Schwartz v. Commissioners (Ind.), 63 N. E., 31; Edwards v. Lesseur, 132 Mo., 410.) In the case of Schwartz v. Com'rs, *supra*, it was said by the Supreme Court of Indiana, that the fact that private parties "made donations * * * * of lands or other means to secure the location of the county seat at the point in question, would not in a legal sense constitute a contract, or preclude or estop the state from removing the seat of justice to a point elsewhere in the county, by subsequent or future legislation."

It follows that no contract obligation was violated by the repealing act in question. The effect, if any, of the repeal upon the Wisser devise, or the relation of the trustees thereto, is not before us for consideration. As to the repealing act we are here concerned only with its effect upon the standing of the Agricultural College as an established institution of learning within the sense of the acts of Congress under which the funds in controversy have been donated. And, let it here be said that we have nothing whatever to do with the policy of the law; that is a matter resting entirely with the legislative branch of the government. Should it be conceded that the Legislature had pursued a mistaken policy, in this affair, that would be no reason for avoiding a statute otherwise unassailable. The constitution and laws have not vested in the courts the right to determine the policy of the state in legislative matters. Mr. Justice Brewer, when sitting as a member of the Supreme Court of Kansas, forcibly stated this proposition as follows: "Here the single question is one of power. We make no laws; we change no constitutions; we inaugurate no policy.

When the Legislature enacts a law, the only question which we can decide is, whether the limitations of the constitution have been infringed upon." (Prohibitory Amendment Cases, 24 Kan., 706.)

Finally it is insisted that the repealing act is obnoxious to the following provision of the constitution: "The Legislature shall not locate any other public institutions except under general laws, and by vote of the people." That provision is found in the last clause of Section 23 of Article VII; and is immediately preceded by clauses designating the temporary location of the seat of government, the State University, the insane asylum and penitentiary, and more remotely, though in the same section, by the provision authorizing the Legislature to submit to the people the location of said institutions and the seat of government after ten years. The argument on behalf of the relators upon this point is, that the act here assailed attempts to dissolve an institution created by the people. The institution was not, however, created or established by the people, as distinct from the Legislature, either through their votes in locating it or otherwise. Nor have the people by the fundamental instrument of their state gevernment reserved to themselves the right to establish or create public institutions.

The people have reserved the power to vote upon the location of such institutions established or proposed to be established. They did so in respect to the college here in question; arid hence we suppose the Legislature would be powerless to continue the college in existence and change its location, without submitting the question of change of location to a vote of the people. In view of the limited relief sought in the case at bar, it is unnecessary to consider the effect of the repealing act upon that part of the original act providing for locating the college; that portion of the act has served its purpose, and, for the purposes of this case, we shall take it for granted, without deciding, that the Legislature could not destroy the effect of the location of the college, or take away its habitation by merely re-

pealing the sections under which the location had been submitted to and determined by the people. The repealing act therefore will be considered only so far as it affects those provisions of the original act which establishes the college, and regulates its affairs and management.

The Legislature is vested with all legislative powers of the state; it may do anything within the domain of legislation which is not repugnant to the State or Federal Constitutions; and constitutional restrictions upon the Legislature are not to be enlarged by construction beyond their terms. Moreover, the power of establishing public institutions is by the constitution expressly vested in the Legislature. Section one of the Article in which the clause above quoted is found imposes upon the Legislature the duty of providing for the establishment and maintenance of free public schools, and "such other institutions as may be necessary." Section eighteen of the same Article provides: "Such charitable, reformatory and penal institutions as the claims of humanity and the public good may require, shall be established and supported by the state *in such manner as the Legislature may prescribe.*"

With the one exception of the *location* of public institutions, the power of the Legislature over them is unrestrained, and its authority supreme. Unless, therefore, to "locate" is to "establish" an institution of the character of the college in question, it is erroneous to say that the people established it. We think that counsel are mistaken in the supposition that, without a location, an institution can not exist. Examples are numerous in the books of public institutions which were established and in existence in advance of their location, or the selection of a site; they may not be in a position to conduct operations until located; but that they may constitute an existing institution, if so declared by the Legislature and provided with a governing board is we think self evident. A building site is as essential to the operation of a college as the selection of the town for its location. Yet it appears that there had been no

building site secured for this college until January 30, 1905, notwithstanding that it had a governing board long prior thereto, who had been intrusted with property for its benefit.

The location of an institution differs essentially from its creation. In many of the cases cited in this opinion the institution involved had been located by a board or commission appointed for that purpose by the act establishing it, and, usually after receiving bids or donations, such board or commission selected a town or place for its location. It seems never to have been supposed, and we apprehend that none would be so rash as to contend, that the board or commission, in locating the institution, had established or created it. Upon principle, however, there would seem to be no difference between such cases and the one at bar in this respect. In those cases the location occurred through the agency of a board, in the case at bar through the agency of the people. True, in the case before us, the agency of the people in such matters is provided for in the constitution; but that we think does not alter the situation in regard to the thing attended to, and required to be determined, by the people themselves.

Two cases in Wisconsin have been cited; they are not in point, though they serve to illustrate the principle under discussion. The constitution of that state deprived the Legislature of any power to create, authorize or incorporate, by general or special law, any bank or institution with powers of banking, except in the manner provided in the constitution, viz: The Legislature was authorized to submit to the voters at any general election the question of "bank or no bank," and if a majority of the voters should be for banks, then the Legislature might grant bank charters, or pass a general banking law; but it was provided that no such grant or law should have any force or effect, until the same should have been submitted to a vote of the electors of the state, and approved by a majority of the votes cast on the subject. It will be seen from this statement that,

even after the people had voted in favor of banks, no law enacted on the subject obtained any force until ratified by a vote of the people. Under such circumstances it was necessarily held that the people had reserved to themselves all the legislative power on the subject of banks and banking, and that a law which had been approved by a vote of the people could not be amended without submitting the amendment to a like vote. (State ex rel. v. Hastings, 12 Wis., 52; Van Steenwyck v. Sackett, 17 Wis., 665.) Now it needs no argument to show that the act establishing the Agricultural College was not submitted to nor ratified by the people. Not a single elector outside of the membership of the Legislature that passed the act of January 10, 1891, and the Governor who approved it, was afforded an opportunity of voicing his opinion at the polls as to whether the college should or should not be established. Who is competent to say whether such a proposition would have carried or not, had its submission been required by the constitution, or had it in fact been submitted? The unnecessary submission of a question or an act to a vote of the people, is held not to be conclusive upon the Legislature. (Dallis v. Griffin (Ga.), 43 S. E., 758.) It might therefore be suggested in passing that had the constitution required the question of establishing a public institution to be submitted to a vote of the people, then the Agricultural College would not have been legally established.

We think it cannot reasonably be said that the dissolution of an institution overthrows the expressed will of the people when there has never been an expression of the popular will upon the subject. At the election in 1892, by virtue of the act of 1891, the electors were given the choice of two alternatives and two only; either to vote for a place as a seat for the Agricultural College, or not to vote at all. That there should be such a college had been determined by the Legislature beforehand; and the constitution does not require that any other choice shall be exercised by the people in the premises, than as to location.

The combined constitutional provisions, as we think they must be read and construed, confer upon the Legislature the sole power of establishing public institutions, subject only to the restriction that they shall not be located except under general laws and by vote of the people. There is nothing in that restraint which, in our opinion, can be construed to require an institution once established by the Legislature to be perpetuated. Having all the power that exists anywhere to establish an institution, it necessarily has the power to dissolve it, unless the doing so involves the violation of some constitutional provision. And, for the reasons stated, the conclusion seems to us inevitable that the dissolution by the Legislature of an institution established by it, though located by vote of the people, is not in contravention of the clause of the constitution requiring the question of location to be settled by the people themselves.

The repeal of the sections of the act establishing the college, providing it with a managing board, and regulating its affairs, is not a removal of its location in the sense of the constitutional provision. The college has not been removed to Laramie, the seat of the University, as argued by counsel, An agricultural college was a part of that institution before the location of the relator college. Where an act of the Legislature disorganized a county, and attached it to another county for judicial, taxing and other purposes, it was held in Minnesota that the act was not to be regarded as removing the county seat, and was not therefore repugnant to a provision of the constitution prohibiting the Legislature from removing county seats without the consent of the people to be affected. ( State ex rel. ,v. McFadden, 23 Minn., 40.) And it is held that where an office is created by the Legislature, the fact that the people may have elected an incumbent will not of itself prevent the Legislature from subsequently abolishing the office. (State v. Douglas, 26 Wis., 428; Conner v. Mayor, 5 N. Y., 285; In re Registers, 117 Mass., 603.)

We are therefore of opinion that the repealing act of 1905 is valid so far at least as to render ineffective that portion of the act of 1891 establishing the Agricultural College, declaring its objects, authorizing the appointment of trustees therefor, and conferring specified powers upon them as such trustees, at least as to the future exercise of such powers. In other words the repealing act has discontinued the Agricultural College established by the act repealed, so far as such college obtained any standing under that act, and therefore deprived the relators of any capacity, which they might otherwise have had to receive and expend the government donations.

We have been deeply sensible of the importance of the questions involved in this hearing, and of the responsibility attaching to a decision of the case. We have not arrived at a conclusion until after the closest consideration, and the most thorough investigation at our command. We have been ably and fairly assisted by counsel representing both sides. We are convinced that the conclusion to which we have been forced is the only one possible, under the constitution, laws, and authorities. For the reasons set forth in this opinion the demurrer will be sustained.

BEARD, J., and VAN ORSDEL, J., *concur*.